JoNES, Chief Judge,
delivered the opinion of the court:
This is a Congressional reference case. Plaintiff in his petition filed in this court pursuant to House Resolution 93, 84th Congress, set out in full in finding 1, seeks to recover compensation for architectural services rendered by him to the Housing Authority of the City of Bryan, Texas, a body corporate, hereinafter referred to as the Local Authority.
The Local Authority and the Public Housing Authority, a constituent of the Housing and Home Finance Agency of the United States Government and hereinafter referred to as the PPIA, were joined by what is known as a Preliminary Loan Contract, the substance of which stated that the Local Authority proposed to develop low-rent housing with financial assistance from the PHA pursuant to the United States Housing Act of 1937, 42 U. S. C. 1430 (1952 Ed.). This contract authorized the Local Authority to make preliminary surveys of a development program which is the basis of an application to the PHA for a construction loan. By the Preliminary Loan Contract the PHA agreed to lend the Local Authority $20,000 to be used for architectural and engineering services and as otherwise needed in preparation of its development program.
Plaintiff, an architect, subsequently entered into a contract with the Local Authority by which he promised to render professional services as therein spelled out. The contract provided that he was to prepare the “development program” and submit it to the Local Authority for approval by it and the PHA. Upon receipt of written notice, plaintiff was then *137 to proceed in the preparation of what we shall refer to as the “intermediate plans,” which were also to be submitted to the Local Authority for approval by it and the PHA. Upon receipt of written approval of the intermediate plans, plaintiff was then to proceed in the preparation of what we shall refer to as the “final plans.”
The Local Authority was notified by the PHA on August 14, 1952, that if it desired its project to be included in the PHA’s 1953 construction quota it would be necessary for the Local Authority to submit the final plans to the PH A not later than November 15, 1952, so that everything would be in order to insure advertisement for bids by December 1, 1952.
The Local Authority desired to be included in the 1953 quota and immediately started action to meet the deadlines specified in the letter. To this end, plaintiff was hired orally in August and immediately started work on the plans for the development program. Plaintiff did not have a written contract with the Local Authority until October 1,1952.
The development program was completed late in September 1952 and plaintiff was instructed by the Local Authority to proceed with the intermediate plans on October 8, 1952. They were completed late in October 1952. Plaintiff proceeded with the final plans and they were completed on November 20, 1952. Advertisement for bids was made on November 19 and 26, 1952, setting December 16 as the date for receiving the bids.
At no time was plaintiff given written notice to proceed with the nest stage of the planning as required by his contract with the Local Authority. The Local Authority acknowledges that it instructed plaintiff to proceed, but states that it did not do so in writing.
The Local Authority claims that it so instructed plaintiff only after receiving oral authorization to that effect from officials of the PHA. Testimony is conflicting on this point. The defendant’s testimony says no such oral authorization was ever given. Plaintiff’s testimony, of course, shows that oral authorization by the PHA was given.
However, about December 1, 1952, plaintiff received word from the Fort Worth Field Office of the PHA that the Wash *138 ington Central Office objected to certain features of the development program with respect to the density of the units,[1] and would not approve it. Apparently, as submitted by plaintiff, the density was below the minimum standards specified by the PHA in their “Minimum Physical Standards and Criteria for Planning and Designing PHA-Aided Low Pent Housing.”
If circumstances warranted, apparently these standards could be deviated from with the approval of the PHA. Testimony indicates that the Fort Worth office of the PPIA approved the deviations contained in plaintiff’s plans. But Washington disapproved in this instance. The result was a dispute between the Fort Worth office and the Washington office as to the authority of each. Washington prevailed. As a result, certain changes in the plans were required. Plaintiff complied sometime after January 30, 1953, and because of this delay the project could not be included in the 1953 quota. Before anything further was definitely planned Congress stopped construction of this type sometime during the year 1954. Consequently the project was never carried forward.
The PHA thereafter authorized the Local Authority to pay plaintiff, and plaintiff was paid, $5,271.78 to which he was entitled, in any event, for the preparation of the development program. On the theory that plaintiff was never authorized to go any further with the plans, the PHA limited payment to that amount. If the project had gone forward to the construction stage, according to the PHA schedule, plaintiff would have been entitled to $25,162.14. Plaintiff here seeks the difference between that amount and the amount he has already received. That difference amounts to $19,890.36.
There are definite legal reasons for denying plaintiff recovery. The evidence presented indicates that there was no privity of contract between the United States and plaintiff, and that plaintiff proceeded in the preparation of the intermediate plans and the final plans without written authorization as called for in his contract with the Local Authority. However, we will not undertake a discussion of *139 the legal aspects of the case, but simply hold that there is no legal claim owing from the United States. Plaintiff apparently concedes this.
Nevertheless, in the referral Eesolution from the House we are requested to determine whether “there is a claim legal or equitable, against the United States.” Eelying on this language, plaintiff seeks to recover because of the equitable aspects of the case. The term “equitable,” as used in the Eesolution should not be interpreted in its strict, narrow sense, but in the broader moral sense based upon general equitable considerations. Burkhardt v. United States, 113 C. Cls. 658 (1949).
In the light of a number of previous decisions by this court, the term should be so interpreted, but because of the unusual circumstances of the case we do not feel that we can recommend the full amount of recovery requested by plaintiff, though we do feel that he is certainly entitled to some compensation for the several months of arduous and highly skilled work that he performed in good faith under the assumption that he was proceeding with, at least, the implied approval of PHA officials.
The case presents a situation where the Local Authority and the PHA entered into a Preliminary Loan Contract on February 5, 1952. There was no action taken by the Local Authority to formulate the plans until August 1952, when the Local Authority received a notification from the PHA that in order for its project to be included in the 1953 construction quota its final plans would have to be in the hands of the PHA by November 15, 1952. It had not yet contracted with anyone to start the work. On receiving this notice it apparently proceeded with all haste, too much haste, in fact, and in the turmoil which followed was cutting as many corners as it possibly could. The PHA Fort Worth office was apparently doing as much as it possibly could to get the Local Authority’s project included in the 1953 construction quota, also. In so doing, we feel that it also was cutting a few corners. To explain — while the testimony is conflicting on many material points, we feel that in substance it indicates that there were conferences between plaintiff as the architect, the Local Authority, and the PHA at all stages *140 of the drafting of the plans by plaintiff. We also feel that the record as a whole shows, despite testimony to the contrary, that, if not given express direction to go ahead with the plans by the Local Authority and the PHA, the circumstances surrounding the conferences and the tenor of the conferences indicate that plaintiff was justified in proceeding. As plaintiff submitted the working plans of the various stages of the planning, suggested changes were made not only by the Local Authority, but also by the PHA. Plaintiff made these changes and after the submission of both the development plans and the intermediate plans was told to go ahead; or if he was not told explicitly to go ahead, it was understood by all that he should proceed to the next stage of the planning.
Plaintiff did not know that each stage of the planning had to be approved by Washington but the PHA, and apparently the Local Authority, knew it. Plaintiff was not advised of the necessity of this approval, but it is claimed that he never requested such information. The two, PHA and the Local Authority, in their haste to get the project included in the 1953 quota must have taken it upon themselves to instruct plaintiff to proceed with the planning without Washington approval. They apparently felt such approval was a matter of course, and that since the Fort Worth office indicated its approval of the plans, Washington would go along with its recommendation. It is in this manner that we meant that the Local Authority and the PHA were cutting corners. Speed was necessary to meet the deadline for 1953 construction.
Plaintiff was the only one who was not cutting corners. Why should he suffer a complete loss? It is implicit from the record that the PHA and the Local Authority felt that they could not meet the deadline if approval from Washington was awaited before continuing on with the next stage of the planning. We think they gambled that Washington would approve. In fact, we think they were confident that Washington would approve and therefore overlapped the work on the next planning stage while awaiting approval of the preceding stage.
*141 This was all without the knowledge of plaintiff. He and his staff were working long hours, twelve- and fourteen-hour days, in order to get the plans finished by the dates specified by the Local Authority. He had nothing to do with the procedure for the approval of the various stages of the planning. He simply continued oh to the nest stage after being told to do so by the Local Authority at the time the previous stage had been submitted and approved by it. He was diligently attempting to do a good and timely job for both the Local Authority and the PHA. Since the Local Authority and the PHA were the ones cutting the corners, we do not feel that they can do so at the expense of the plaintiff. At the same time, we must take into consideration that the plaintiff should have required written notification to proceed, that is, at least he should have strictly complied with the terms of the contract he had with the Local Authority, which required written notification to proceed.
We must also choose between the conflicting testimony of both sides relative to whether or not the PHA officials, orally or otherwise, advised plaintiff that it would be all right to proceed. If PHA did so advise plaintiff, and we are sure that, at least, it led plaintiff to believe that he should proceed, the situation is one where Government officials, who certainly had the apparent authority to do so, caused plaintiff to put himself in a position in which he would stand to suffer a pecuniary loss. Of course, we are always cognizant of the legal doctrine that anyone dealing with the Government must ascertain the limits of the authority of those purporting to act for the Government and that if he fails to do so and suffers a loss thereby he has no recourse against the Government. Federal Corp Insurance Corp. v. Merrill, 332 U. S. 380, 384 (1947); Gay Street Corporation of Baltimore v. United States, 130 C. Cls. 341 (1955).
However, we are not making a strictly legal determination. We are to determine the situation within the scope of the Resolution from the House of Representatives giving this court jurisdiction of the matter. That referral requests us to report to the House “the nature and character of the demand, as a claim legal or equitable, against the United *142 States, and the amount, if any, legally or equitably due from the United States to the claimant.”
We have held in Burkhardt v. United States, supra, the manner in which the term “equitable” as used in cases referred to this court by the Congress should be construed. We quote from page 667:
We are therefore of the opinion that the term “equitable claim” as used in 28 U. S. C., Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations. * * *
In the case before us we feel that we should so apply that construction of the term “equitable.” Because of the diametrically opposed testimony on some points it is very difficult to determine where the actual fault lies. We feel, however, that the equities will be balanced if the parties to this controversy, the United States Government and the plaintiff, share the loss.
Civilized men have outgrown the legend that the king can do no wrong. But there is a lingering of the old notion in the rule that a man 2,000 miles away must read.the mind and know the limit of authority, cautiously stated and sometimes nebulously worded by someone sitting at a desk in Washington, who frequently knows little of the conditions that prevail in the faraway areas of this broad, big country.
When the entire record is read there is not the slightest doubt that, the PHA officials were urging that the work proceed. At the same time it is clear that the plaintiff did not actually know of the limited authority of the PHA officials.
We, therefore, recommend to Congress that in the peculiar circumstances of this case the parties should share the loss and plaintiff should be reimbursed to the extent of one-half of the amount he claims, a total of $9,945.18.
This opinion and the findings of fact will be certified to Congress pursuant to House Resolution 93, 84th Congress.
Reed, Justice (Bet.), sitting by designation; MaddeN, Judge; Wi-iitakeR, Judge; and LitiletoN, Judge, concur.
*143 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a Congressional reference case. On March 29, 1955, the House of Representatives of the Congress of the United States, 84th Congress, passed House Resolution 93, reading as follows:
Resolved, That the bill (H. R. 1485) entitled “A bill for the relief of William E. Nash,” together with all accompanying papers is hereby referred to the United States Court of Claims, pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
The claim described in the Resolution is the claim set forth in the plaintiff’s petition.
2. Plaintiff, William E. Nash, is an individual residing in the City of Bryan, Texas, and is, and was at all times material hereto, a practicing architect, being licensed as such in accordance with the laws of the State of Texas and is a member of the American Institute of Architects.
3. At all times material to this action, the Housing Authority of the City of Bryan, Texas, hereinafter referred to as the “Local Authority,” was a body corporate, organized and existing under and by virtue of the laws of the State of Texas. The Public Housing Administration, hereinafter referred to as PITA, was a constituent of the Housing and Home Finance Agency of the United States Government during the period involved in this suit.
4. On February 5,1952, the Local Authority and PHA executed a Preliminary Loan Contract. The contract states that the Local Authority proposes to develop low-rent hous *144 ing with financial assistance from PHA pursuant to the United States Housing Act of 1937 and to undertake preliminary surveys and planning needed to prepare and submit development programs as a basis for application to PHA for an Annual Contribution Contract. PHA agreed to lend not over $20,000 for use in such planning, and stipulated that no part of said money should be used for any other purpose. This contract authorized the Local Authority to contract for architectural and engineering services necessary for the projects to be developed pursuant to the program reservation. The contract further provided that, in the event of the execution of an Annual Contributions Contract covering such project, the architects and engineers should furnish the architectural and engineering services necessary for the completion of the project. Similarly, the Local Authority was authorized to purchase dollar options on realty, but was prohibited from using funds to acquire lands or land contracts before an Annual Grants Contract was executed. Other contract provisions certified the approval of the President of the United States of the Preliminary Loan Contract, restated that the program reservation would be cancelled unless a development plan satisfactory to PHA was submitted by January 31,1953, provided that no act or omission of the Local Authority should create liability on PHA under the contract to any third party, and provided that neither the execution nor any act under the Preliminary Loan Contract should be construed as constituting any legal liability on PHA to enter into an Annual Contributions Contract, but reserved to PHA, in its discretion, the right to determine whether an Annual Grants Contract should be executed. The document limited the Local Authority to a preliminary study of the project to determine its economic and financial feasibility for proposal to the President, with the continuation of the project dependent upon the President’s approval.
5. Plaintiff had previously done the architectural work on a prior housing project in Bryan, Texas, designated as Tex. 20-1. In August of 1952, Nash was verbally employed by the Local Authority as architect for the project and, shortly thereafter, Nash and the Local Authority entered into a written contract dated October 1, 1952, pro *145 viding for the furnishing of architectural services by Nash on the project designated as Tex. 20-2.
6. On August 14, 1952, Mr. Joe P. White, Director of the Bryan Local Authority, received a letter dated August 13, 1952, from the Director of the Fort Worth Field Office of the PHA, reading as follows:
As you know a limitation has been placed upon the Public Housing Administration by the Independent Offices Appropriation Act of 1953 to the effect that it may not authorize the commencement of construction of more than 35,000 units of public low-rent housing during the year beginning July 1, 1952.
Public Housing Administration has entered into Preliminary Loan Contracts with Local Housing Authorities for approximately 155,000 units. Of this number, 63,500 are already under Annual Loan and Contributions Contract.
In order to establish a priority list and to accomplish the building of 35,000 units, it was necessary to set up allocations in excess of this amount to provide for casualties. In other words, some Local Authorities may run into difficulties and cannot proceed rapidly with their projects. In order to insure construction of 35,000 units, Public Housing Administration allocated approximately 44,000 on the priority list, thus providing for a casualty of 9,000 units. In other words, 9,000 of these units will not be authorized for construction during the present fiscal year.
For your information, 15,000 of the 35,000 have already progressed so far that they have already been advertised for bids or will be within the next few weeks, leaving only 20,000 more than can be authorized this current year. We have been informed that, no doubt, 35,000 units will be ready for advertising for bids by December 1, and those that are not ready will have to be deferred until the next fiscal year.
A production schedule has been established for each project on the priority list which calls for submittal of the bid documents (final drawings and specifications), to the Field Office not later than a specific date to insure advertisement for bids by December 1, 1952. In order for you to accomplish this, it will be necessary for all final bid documents to be in our hands for review not later than November 15,1952, and a number before that date, since obviously this office could not review its allotment of 53 projects in two weeks.
*146 Another condition is that you must be in possession of all the land on the project site by the date of the contract award which is usually within thirty or sixty days after opening of bids. This would establish a date no later than the following:
Bid Advertising_December 1, 1952
Opening of Bids_January 1, 1953
Award of Contract_February 1, or March 1, 1953.
The projects of your Authority on the allocated list for advertisement of bids on or before December 1,1952, are as follows:

Project Number Number of Units

TEX-20-2 110
It is most important that you promote your development work in such a way as to insure the bid documents reaching us not later than the time indicated, and to expedite the land acquisition so that, by December 1, 1952, we may be definitely assured, beyond any reasonable doubt, that all land will be in your possession before the date of construction contract execution.
Within a few days we will send you a Circular showing you how the priority list was established. We urge you to give this matter your immediate attention to insure construction of your housing within the 35,000 units authorized for this year.
I must advise you that in the event any of the 53 projects presently scheduled for this office are not ready for bid advertisement by December 1, 1952, they may be removed from the priority list.
On September 19,1952, White received a letter dated September 18, 1952, from the director, Fort Worth Field Office of the PIIA reading as follows:
As you have previously advised, your Authority has been allocated certain dwelling units for construction during the present fiscal year. .
In order to assure construction starts for 35,000 dwelling units under the limitations imposed by Congress in the Independent Offices Appropriation Act of 1953, over 43,000 units have been allocated with priority such as those for your community. In order to be assured of your dwelling units being included in the 35,000 total which can proceed to construction, it will be necessary that bids be advertised for construction no later than December 1,1952, with a bid period of 30 days and with a holding period of 60 days.
*147 The purpose of this letter is to advise you that under no circumstances will this office be in a- position to authorize execution of a construction contract unless we are satisfied that your Authority has possession and right of entry on all the land contemplated by the construction contract.
While it is quite apparent that there should be ample time to acquire such possession and right of entry well in advance of the date indicated above, it must be recognized that land acquisition at times presents some entirely unforeseen delays, and we urge you to anticipate this possibility.
The purpose of this letter is to emphasize that possession and right of entry must be cleared before execution of a construction contract.
7. The letters referred to in finding 6 above were interpreted by the Local Authority to mean that, if the plans were completed by the December 1 deadline, the project would be built.
8. The contract between plaintiff as architect and the Local Authority provided, in part, as follows:
WHEREAS, the Public Housing Administration (hereinafter called the “PHA”) has made an allotment of funds to aid the Local Authority in financing the construction of a low-rent housing project known as (No name designated) ,
Project No. Tex. 20-2, in the City of Bryan, State of Texas, (hereinafter called the “Project”), under the provisions of the United States Housing Act of 1987, as amended, and
WHEREAS, the PHA. requires that the Local Authority submit to the PHA a program for the development of the Project, and
WHEREAS, the Local Authority desires to obtain from the Architect the architectural and engineering services necessary for the preparation of the program for the development of the Project, and if the program is approved, the Local Authority desires to obtain additional services;
NOW THEREFORE, the parties hereto do mutually agree as follbws:
1. Employment of the Architect. The Local Authority hereby employs the Architect and the Architect agrees to perform professional services as follows:
*148 a. The Architect will prepare plans and other documents satisfactory to the Local Authority as more fully described in Section 6 hereof.
b. The Architect will prepare intermediate working drawings, specifications, and other documents satisfactory to the Local Authority and to the PHA and perform other services, all as more fully described in Section 7 hereof.
o. The Architect will prepare final working drawings, specifications, and construction contract documents satisfactory to the Local Authority and to the PHA, and perform other services, all as more fully described in Sections 8, 9, and 10 hereof.
$ $ $ $ $
5. Limitations on Design.
a. Minimum Standards. The Improvement shall be designed to meet the “Minimum Physical Standards and Criteria for Planning and Designing PHA-Aided Low-Rent Housing” issued by the PHA.
b. Cost Limitations. The Improvement shall be designed to be built within the Estimated Improvement Cost as hereinafter defined, and to comply with requirements of the United States Housing Act of 1937, as amended.
$ * $ $ $
6. Prelimi/nary Documents.
a. The Architect shall prepare and deliver to the Local Authority, for use in formulating the Development Program for the Project, the following documents:
(1) A site plan * * * showing the approximate location of buildings and roadways * * *.
(2) A plan of the site showing the layouts for the various utility services * * *.
(3) Sketch plans of dwelling units with indicated locations for furniture items as stipulated in the above-mentioned “Minimum Physical Standards and Criteria for Planning and Designing PHA-Aided Low-Rent Housing: also, * * *.
(4) Brief outline specifications * * * of materials and construction proposed.
(5) Estimate of the construction costs of the Improvement * * * in the detail necessary to permit the calculations of fees * * * in accordance with Exhibit A * * *.
b. The total amount of the estimate referred to in the preceding subparagraph (5), as approved by the Local *149 Authority and the PHA, is hereinafter called the “Estimated Improvement Cost.”
c. The preliminary drawings and specifications, together with the said estimate, all as described in this Section, are hereinafter referred to as the “Preliminary Documents.”
7. Intermediate Documents. Upon receipt from the Local Authority of written notice to proceed, * * *:
а. The Architect shall prepare and deliver to the Local Authority drawings and specifications for the Improvement. Such drawings shall be working drawings in an intermediate stage * * * and * * * together with the specifications shall establish definitely the design and general dimensions * * *.
б. The items (1) through (8), preceding, are hereinafter referred to as the “Intermediate Documents.”

c. * * *.

d. The Architect shall prepare the Intermediate Documents to meet the approval of the Local Authority. During the preparation of the Intermediate Documents the Architect may request a review or reviews of such documents by the Local Authority or the Local Authority may elect to make such a review or reviews. * * * However, no such review shall relieve the Architect of his responsibility for conforming the Intermediate Documents to the requirements of Section 5.
8. Working Drawings and Specifications: Upon receipt, from the Local Authority of written notice to Eroceed, the Architect shall prepare and deliver to the .ocal Authority complete working drawings and specifications * * * adequate for contractual and construction purposes * * *.
******
(c) During the preparation of the Working Drawings and Specifications, the Architect may request a review or reviews of such documents by the Local Authority or the Local Authority may elect to make such review or reviews. Every such review shall be made by the Local Authority within a reasonable length of time. However, no such review shall relieve the Architect of the responsibility for the accuracy of the Working Drawings and Specifications or for their conformance to the requirements of Section 5.
*****
19. Time and Order of Architect's Services. The Architect shall furnish the documents and provide the *150 services herein required in such sequence and at such times as may be necessary to insure the prompt and continuous prosecution of the work of designing and constructing the Improvement. Without limiting this requirement, the Architect agrees to prepare and deliver to the Local Authority:
(1) The Preliminary Documents within 20 calendar days from the date of receipt of notice to proceed therewith.
(2) The Intermediate Documents within 20 calendar days from the date of receipt of notice to proceed therewith, and
(8) The Working Drawings and Specifications within 30 calendar days-from the date of receipt of notice to proceed with the same, provided that such times shall be prolonged to the extent of any delay caused by the Local Authority or by conditions otherwise beyond the control of the Architect.
20. Lump-Siim Fee. * * *. Each such fee shall be based on the Estimated Improvement Cost or a certain part or parts thereof and shall be determined in accordance with the schedule of fees hereto attached as Exhibit A and hereby made a part of this contract. Upon approval by the PHA of the program for the development of the Project, as referred to in Section 6, the amounts of the said fees shall be calculated and mutually agreed upon by the Local Authority and the Architect. The sum of the various fees so determined shall constitute the lump-sum fee payable to the Architect under this contract.
The contract did not specifically state that the development program must be approved by the Washington Central Office of the PHA. The contract further provided for calculation of the architect’s fee based on the estimated cost of the project, and provided that the architect would be paid 15% of the total fee upon approval by the Local Authority of the preliminary documents (development program), 25% upon approval by the Local Authority of the intermediate documents, and 30% upon approval by the Local Authority of the final working drawings and specifications.
9. At the time Nash executed the contract, quoted in part in finding 8, and during the time he was performing the services hereinafter described, he did not know that approval of the Washington office of the PHA would be a prerequisite *151 to bis getting paid for bis work. He did not see tbe letters set forth in finding 6 above, nor learn of any limitation on. the number of projects to be built, until after bis work was completed. He was informed that the plans had to be completed before the December 1 deadline. He was unaware, until after the work was completed, of the provisions of the Preliminary Loan Contract between the PHA and the Local Authority.
10. In formulating, planning, and building a housing project, the Fort Worth Field Office customarily appointed a “Project Planner”, whose duty it was to coordinate the efforts of the architects, the engineers, the Local Authority and the various departments of the Fort Worth Field Office, and who acted as the principal contact between the Fort Worth office and the field. The project planner on Project Tex. 20-2 was Charles Kobert Johnson, who had also been the project planner on the previous project, Tex. 20-1.
11. Immediately upon his being orally employed by the Local Authority, in August of 1952, plaintiff Nash commenced work on the development program for project Tex. 20-2. In accordance with his contract, Nash hired engineers to perform the necessary engineering services in connection with the project, among the engineers being the firm of Carter & Burgess in Fort Worth.
In formulating the site plans for the project, Johnson visited the City of Bryan, Texas, together with a representative of Carter & Burgess. The density pattern used in the site plan was suggested to the architect and engineers by Johnson, and was the result of joint efforts on the part of the architect, engineers, the Local Authority, and personnel of the Fort Worth office. The site plan concerned the general layout of the buildings on the property, and the density pattern referred to the number of dwelling units per acre. The density pattern used in this instance was lower than the prescribed minimum' which had been previously enforced by the PHA, and was based on the experience of the Fort Worth office that the prescribed minimum resulted in too tight a density for residential areas in the region involved. The previous enforcement of the minimum *152 had been somewhat relaxed, and Johnson told the plaintiff and the Local Authority that they “could loosen up a little bit from the original project, 20-1, and acquire a little more ground.”
12. During this period, and throughout the planning of the project, the work load in plaintiff’s office was heavy, and other work had to be deferred in order to complete the plans for Project 20-2 by the deadline which had been set. Timely completion necessitated the working of ten, twelve and fourteen hours per day by Nash and his staff.
13. Late in September 1952, the development program was completed by plaintiff. It was submitted to and approved by the Local Authority October 6,1952, on which date it was forwarded to the Fort Worth office of the PHA.
14. There is conflicting testimony as to whether on or about October 8,1952, Mr. Joe White of the Local Authority was instructed by Mr. Johnson of the Fort Worth office, in a telephone conversation, to instruct the architect to proceed with the intermediate plans, in view of the shortage of time before the deadline. White claims he instructed Nash in accordance with Johnson’s instruction. Throughout the planning for the project, plaintiff, the Local Authority, and the engineering firm of Carter & Burgess were continually urged by various persons in the Fort Worth office of the PHA to proceed with all possible haste in the preparation of the intermediate drawings and final drawings so as to meet the deadline.
15. On October 15, 1952, Mr. White and plaintiff met in the Fort Worth office of the PHA with Mr. Johnson, Mr. Digby-Roberts (head of the Project Planning Section), Mr. Capelle (head of the Technical Section), and Messrs. Cameron and Carrington (members of the Technical Section). The purpose of the meeting was to review the development program which had been previously submitted. At this meeting, the personnel of the Fort Worth office suggested various changes in the development program, all of- which changes were promptly made by plaintiff. The development program was approved by all necessary personnel in the Fort Worth office and forward to Washington. Neither at this meeting, nor at any other time during the *153 planning of the project, was any objection raised by the Fort Worth personnel concerning the density pattern of the project.
16. On or about October 22,1952, the Local Authority and the architect received from the Labor Relations Officer of the Fort Worth PHA office a schedule of wage rates to be used on Project 20-2. The wage rate schedule was sent out by the Labor Relations Officer pursuant to notice received from the Project Planning Section of the Fort Worth office, which notice is customarily sent 30 days prior to the time the architect will need the wage rates. The wage rates are needed only in connection with final specifications, which are attached to the final working drawings on the project.
17. Near the end of October 1952 the intermediate drawings were completed by plaintiff and were approved by the Local Authority. On October 31, 1952, the intermediate drawings were presented to the Fort Worth Field Office in person by plaintiff and Mr. White. Present at this meeting were the same persons who had been present at the previous meeting reviewing the development program (finding 15).
At this time, the intermediate plans were reviewed by the Fort Worth office, and changes were suggested which plaintiff promptly made. Also on this occasion, Mr. Capelle wrote in his desk diary that intermediate plans on Project Tex, 20-2 had been submitted, and that they were “well advanced for finals.” The plans were considered by all present as intermediate plans, as that term is commonly applied to plans on projects of this nature. So far as was known to plaintiff and to Mr. White, the plans were officially reviewed by the Fort Worth office at that meeting and were officially approved by the Fort Worth office. Again at this meeting, as at previous meetings, personnel of the Fort Worth office urged upon plaintiff and Mr. White the necessity of completing the final plans before the December 1 deadline.
18. During this period, plaintiff sent, and the Fort Worth office received, several letters transmitting plans and requesting information concerning the project, all of which related to the intermediate and final plans. Also, the Fort Worth office sent receipts to Nash evidencing receipt by the *154 Fort Worth office of plans and other papers prepared by Nash, all of which related only to intermediate and final plans.
19. On or about November 14,1952, Johnson called White on the telephone and instructed him to advertise for bids on Project 20-2. Accordingly, advertisement for bids was placed in the Bryan Daily Eagle on November 19 and November 26, 1952, setting December 16 as the date for receiving bids. The plans were mailed out to various contractors who might be interested in bidding on the job.
20. On or just prior to November 20, 1952, plaintiff completed the final working drawings for Project Tex. 20-2 and submitted them to the Local Authority, which approved them. On November 20,1952, the final plans were presented to the Fort Worth office in person by Mr. Nash and Mr. White, the same persons being present as at prior meetings. At this meeting, the Fort Worth personnel suggested various changes in the final working drawings and specifications, all of which changes were effected by plaintiff.
21. On or about December 1, 1952, the Fort Worth Field Office of the PHA notified plaintiff and White that the Central Office at the PHA in Washington objected to certain features in the site plans on Project Tex. 20-2, particularly with respect to the density of the units. No instructions were given to plaintiff or White to make any changes in the development program. Plaintiff, White, and Carter & Burgess were assured by Mr. Johnson of the Fort Worth office that the matter could be straightened out between the Fort Worth office and Washington, and he further stated that the Fort Worth office felt Washington was exceeding its authority, and that the Fort Worth office intended to use this project as a guinea pig to test Washington’s authority.
22. On December 4,1952, pursuant to instructions from the Fort Worth office, Mr. White advertised an extension of the bid date to January 14,1953.
23. A difference of opinion developed between the Fort Worth office and the Washington office with respect to the site plans, and particularly the density pattern, on Project Tex. 20-2. The personnel of the Fort Worth office favored the development program as prepared by plaintiff, and felt *155 that Washington was in error in the objections raised thereto.
During the period of disagreement, a memorandum prepared by Mr. Johnson was sent from the Fort Worth office to Washington on December 4,1952, setting forth the reasons the circumstances. At approximately the end of January, 1953, the Fort Worth office received a memorandum from Washington dated January 30, reiterating Washington’s objections and stating that it was then too late to construct the project.
Congress stopped further projects of this type sometime during the year 1954.
24. Because he was informed and led to believe by the Fort Worth office that the matter would be straightened out without any further action on his part, plaintiff made no attempt to visit Washington to try to iron out the differences between the two offices.
25. Until it received the Washington memorandum of January 30, or shortly prior thereto, the Fort Worth office of the PHA was not aware that Project Tex. 20-2 could not be built and that the allotted number of units for construction in the fiscal year involved had been.filled.
26. Pursuant to instructions from the Fort Worth office, after receipt of the Washington memo of January 30, 1953, the advertisement for bids was finally cancelled by White.
27. No person in the Fort Worth office ever refused to review any of the intermediate or final drawings or related documents submitted by Nash or by the engineers. The Fort Worth office never requested plaintiff, the Local Authority or the engineers to hold up work on the project pending approval of the development program in Washington.
The procedure followed in connection with this project, except for the haste necessitated by the deadline, was similar to that followed in connection with Project 20-1, which was worked on by plaintiff, White, and the firm of Carter & Burgess. It was the same as that followed on other projects participated in by Carter & Burgess, who have done more work in connection with housing projects than any other engineering firm in that area. All personnel involved in the Fort Worth office were aware that plaintiff, the Local Authority and the engineers were working on intermediate and final *156 drawings, prior to receiving approval of the development program by the Washington office.
28. No action was taken and no work done by Nash, the Local Authority or the engineers except upon instructions and authorizations from personnel of the Fort Worth office. The persons who gave those instructions were the same persons with whom the parties had previously dealt on other projects, and who had apparent authority to give such instructions and make such authorizations. It was the customary practice for architects and engineers working on housing projects for the Fort Worth office to proceed without waiting for written approval or written authority, in order to expedite the work, and such practice was ¡mown to the personnel of the Fort Worth Office.
29. After receiving the memorandum from Washington of January 30,1953, the Fort Worth Office for the first time requested plaintiff and the Local Authority to make changes in the development program in order to comply with Washington’s views. Such changes were made, and the plans resubmitted to Fort Worth.
30. On July 22,1953, a meeting was held in the Fort Worth Office of the PHA, at which were present the plaintiff, Mr. White, Mr. Rogers (Assistant Director of the Fort Worth PHA Office), Mr. Digby-Roberts, Mr. Capelle, Mr. Phares (an attorney for the Fort Worth Office of the PHA), Mr. Johnson, and others. No one at that meeting told plaintiff or White that they had proceeded without authority from the Fort Worth office, though there is conflicting testimony on this point. At that meeting the possibility was discussed by the Fort Worth PHA personnel of using the remainder of the preliminary loan money which might be made available on Project Tex. 20-2 to pay plaintiff’s fee or a part of it. There was also discussed the possibility of terminating the contract between Nash and the Local Authority under the abandonment provisions thereof, arranging for payment of an equitable fee to Nash for his work. The Local Authority, after the July meeting, passed a resolution abandoning the contract and stating that the Local Authority was indebted to Nash in the approximate amount of $19,000.00.
*157 31. Of the preliminary loan money originally approved in the amount of $20,000, only $13,600 was ever received by the Local Authority. Of this amount, some $1,100 or $1,200 remained on hand after abandonment of the project. At the request of the Fort Worth Office of the PHA, this amount was returned to the PHA. No additional funds were granted.
32. The Local Authority did not have and has no other fund with which to pay plaintiff. The prior housing project, Tex. 20-1, operates at a deficit, and any surplus or profit which might be realized therefrom must, under the contract between the Local Authority and the PHA, be returned to the PHA.
33. On September 15,1953, Mr. White received from Mr. Stenzel, the Director of the Fort Worth Office of the PHA, a telegram reading as follows:
RESTRICT TOTAL PAYMENTS TO YOUR ARCHITECT. TEX-20-2, TO NOT OYER $5,284.35 BEING 15 PERCENT DUE IN ACCORDANCE WITH CONTRACT. COMMISSIONERS CIRCULAR 9-2-53 “ACTION IN RESPECT TO PROGRAM RESERVATIONS AND PRELIMINARY LOAN CONTRACTS PURSUANT TO THE CONGRESSIONAL LIMITATION ON THE LOW RENT PUBLIC HOUSING PROGRAMS” WHICH INSTRUCTS LOCAL AUTHORITIES TO SETTLE OUTSTANDING ARCHITECT CONTRACTS ON BEST TERMS POSSIBLE, DOES NOT APPLY THIS CASE.
34. Documentary and oral evidence offered by defendant emphasized what was referred to as the legal requirements of any plan to construct low-cost housing units under the authority granted the President by Congress. The United States Housing Act of 1937 (42 U. S. C. A. 1430) was enacted for the purpose of promoting the general welfare by employing Federal funds and credit to provide better housing conditions for low-income families. Certain limitations were imposed by the Act upon the agency charged with carrying out or implementing the general purpose of the legislation. For example, Section 6 (d) of the act states that “No annual contribution, grant or loan, and no contract for any annual contribution, grant or loan, under this chapter, shall be *158 undertaken by the Administration except with the approval of the President.” Congress also reserved to itself the power to limit the total amount of construction in any fiscal year. (Public Law 455 (66 Stat. 403) passed by Congress July 5, 1952.)
35. PHA set up a central office in Washington, D. C., for the purpose of recommending projects to the President for his approval. It also established district offices to assist local authorities in planning projects and to submit project plans to the central office. No authority was delegated by the law to the district offices or the central office to grant loans and neither could exceed the limitations established by the Congress. As part of its procedure, PHA furnished local authorities with a Low-Rent Housing Manual of procedure and a Code of Minimum Specifications. The Manual was supplemented from time to time. A supplement to the Manual was issued to all housing authorities on July 9,1952, quoted in part as follows:
Policy Revisions Necessary to Obtain Approvable Construction Costs (Revised)
The text quoted below was issued in circular form on May 26, 1951, to Local Authorities, and Central Office and Field Office officials. It is being reproduced without change in this Section of the Low-Rent Housing Manual in order to make references to the circular unnecessary.
“1. Starting Working Drawings Before Approval of Development Program. Since it is clear that decisions made in the preliminary stages of project design will generally affect Total Development Costs to a far greater extent than those made subsequently, it obviously is inexpedient (as well as in violation of the intent of the Architect’s Contract) for architects to proceed with working drawings in the intermediate stage before all major decisions which must be embodied in the Development Program have been resolved. Therefore, Local Authorities should not give express or tacit approval for architects to proceed with the intermediate working drawings until the Development Program has been approved as evidenced by Presidential approval of an Annual Contributions Contract. The Local Authority should advise them that to do otherwise is to proceed at their own risk.”
*159 36. The plaintiff has been practicing the profession of architecture since his graduation from Texas A & M University in 1937. He was licensed in Texas in 1939 and is a member of the American Institute of Architects. He has been responsible for the performance of architectual work connected with millions of dollars worth of construction, a substantial part of which was for government agencies. His office has been in Bryan, Texas, since 1939. He was familiar with the terms of the Architect’s Contract provided by PHA and has been a party to two of them. On both housing projects, for which he was responsible, he associated himself with a firm of engineers who had done more Federal housing work than any firm in Texas. There is no proof that the Local Authority or its Executive Director refused to make available to plaintiff all the details of its arrangements with PHA or that the Fort Worth Office of PHA refused to advise plaintiff of PHA procedures and requirements, or that plaintiff ever requested such information or advice.
37. In preparing the development program and intermediate and final plans of Project Tex. 20-2, plaintiff, in accordance with the contract between himself and the Local Authority, engaged the services of various engineers to perform the engineering work incident to the planning. Plaintiff’s contracts with such engineers were not on a contingent basis, and, accordingly, plaintiff is indebted to them for their fees. The total fees of such engineers, computed according to the contract between plaintiff and the Local Authority, amount to $13,280. Of this amount, plaintiff has paid to such engineers $1,974.77, leaving a balance owing, by plaintiff to the engineers, of $11,305.23.
38. Under the terms of the said contract, plaintiff’s total fee on Project Tex. 20-2, had it been built, would have amounted to $35,145.17. Under the contract, for preparation of the development plan and intermediate and final plans, plaintiff, as architect, is entitled to receive 70 percent of the total fee, or $24,601.62. In addition, plaintiff disbursed the amount of $560.52 for reimbursable expenses such as blueprinting, binding and mailing plans and specifica *160 tions, making plaintiff’s total fee and compensation under said contract $25,162.14. The PH A has authorized payment to plaintiff, and plaintiff has been paid the sum of $5,271.78, leaving as a balance the amount claimed by plaintiff herein, $19,890.36, which is a reasonable fee for the services performed by him in connection with Project Tex. 20-2.

 The term “density of units'’ refers to the number of dwelling units per acre.