Carlos ACUNA et al.

v.

The UNITED STATES.

Congressional Reference No. 1–78.

United States Claims Court.

Nov. 1, 1982.

Carl A. Albert, Los Angeles, Cal., for plaintiffs.

Glenn E. Harris, New York City, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

1. The trial commissioner indicates that H.R. 1394 lists "123 named individuals", and alludes to "123 plaintiffs." In H.R. 1394, one name ("Eugene Siebern") is listed twice; the petition, which is controlling, names only 122 plaintiffs.

Before WOOD, Presiding Judge of the Review Panel, KOZINSKI, Chief Judge and YOCK, Judge.

OPINION

WOOD, Judge:

By House Resolution 83, 95th Cong., 1st Sess., passed April 18, 1978, the House of Representatives referred to the Chief Commissioner, United States Court of Claims, H.R. 1394, "A bill to provide for the relief of certain former employees of Western Airlines," pursuant to sections 1492 and 2509, title 28, United States Code, "for further proceedings in accordance with applicable law."

The Chief Commissioner referred the matter to a trial commissioner for further proceedings in accordance with the applicable rules, and has duly designated the above members of the Review Panel to review the "findings and conclusions of the trial commissioner * * * together with the record in the case * * *" and to submit to the Chief Commissioner, for transmission to the House of Representatives, its report thereon.

I

H.Res. 83 (and H.R. 1394) require inquiry and report whether the "claims [of some 122[1] former Western Airlines flight engineers] against the United States for termination of their respective employment with Western Airlines, who in 1961, in reliance on the United States Government assurances that they would be reinstated without reprisal, refrained from filing grievances or taking other action concerning the termination of their employment by Western Airlines" are, in the words of Section 2509, "a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

Paragraphs 4, 5, Appendix D, Rules of the United States Court of Claims (1969); see also Paragraphs 3, 4, Appendix D, Rules of the United States Claims Court (1982).

On October 26, 1981, the trial commissioner filed his findings of fact in the case, together with the conclusions that "plaintiffs have no legal claim against the United States; * * * that the plaintiffs have a valid equitable claim against the United States * * * "; that an amount "equal to the damages caused to plaintiffs as a result of" what the trial commissioner termed defendant's "failure to follow through on * * * " certain promises [2] was equitably due them; and that payment of "such an amount would not be a gratuity." [3]

Defendant has timely excepted to the trial commissioner's conclusions and to certain of his findings of fact. Plaintiffs have not done so, requesting instead that the trial commissioner's findings and conclusions be upheld. The matter has been fully briefed, and the parties have presented oral argument before the Review Panel.

In essence, the trial commissioner concluded that the United States has a valid financial—if equitable—obligation arising out of events that occurred more than two decades ago, to persons who then worked not for defendant but for a private employer; who participated in a wildcat strike and then failed to return to work; who were promptly fired; and who were never thereafter rehired by that employer.

Requiring the federal government to pay to a quondam employee of a private company all or any part of monies not paid to him by his former employer because of a decision, untainted by any hint of illegality, to fire (and not to rehire) that employee would be extraordinary under any circumstances. For reasons hereinafter appearing, no basis for upholding the validity of a claim, legal or equitable, to any such beneficence has been shown. The Review Panel is of the opinion, rather, that plaintiffs have neither a legal nor an equitable claim against the United States, and that any payment on the claims would amount to a gratuity.

The foregoing report is hereby submitted, pursuant to Section 2509, *supra,* as amended,[4] to the chief judge for transmission to the House of Representatives.

## II

■ The facts essential to understanding of the claims embodied in the reference, and to conclusions respecting them, are set forth below.[5] Because of the antiquity, and the persistence, of the controversy, it is appropriate, if not essential, that they be stated in some detail.[6]

As of early 1961, plaintiffs were employed by Western as flight engineers.

---

2. Specifically, the trial commissioner concluded that there had been a breach by defendant of a "moral obligation * * * to back up its promise [to plaintiffs] * * * that defendant would take care of them," by making sure that Western rehired them as flight engineers, leaving plaintiffs with "empty promises and no jobs."

3. Pursuant to [then] Rule 131(c) [now Rule 42(c)], the trial commissioner limited trial to the issues of law and fact relating to liability, deferring the "damage issue * * * until after liability had been established."

4. Section 139(h), Act of April 2, 1982, Pub.L. 97–164, 96 Stat. 25, 42–43, effective October 1, 1982, amended Section 2509 by replacing references to "trial commissioner" and "chief commissioner" with "hearing officer" and "chief judge." Where appropriate, however, the terminology in force prior to October 1, 1982, has been, and will hereinafter be, used in this report.

5. The trial commissioner's findings of fact are modified by the Review Panel so as to conform with this opinion. Most of the underlying, ba-

sic, facts are not in any dispute. The factual controversy focuses principally on the propriety of the trial commissioner's findings of government "representations" that defendant would "make sure" Western Airlines reemployed plaintiffs, and that governmental "lobbying efforts" with federal agencies designed to force Western to do so would have been both proper and successful. Defendant takes vigorous, and valid, exception to the trial commissioner's findings in these respects, and to his treatment of the problem of laches as well.

6. While the trial commissioner's findings of fact are entitled to a presumption of correctness, it is the ultimate responsibility of the Review Panel to determine the preponderance of the evidence in this congressional reference. *ISC Metals, Inc. v. United States,* Cong.Ref. No. 6–72, filed February 11, 1980, slip op. at p. 4 (synopsis at 223 Ct.Cl. 626); *Datronics Engineers, Inc. v. United States,* 210 Ct.Cl. 665, 671–72 (1976).

They had served with Western for from 3 to 25 years, and then averaged some 10 years' seniority with the airline. At the majority of major airlines (including Western), flight engineers were then considered to be of a different craft or class than pilots. Flight engineers generally were represented by the Flight Engineers International Association (FEIA), and plaintiffs were all members of the Western Chapter of FEIA.

The Airline Pilots Association (ALPA) represented airline pilots at the major airlines (as well as all flight deck personnel, including flight engineers, at a small number of minor airlines). The majority of major airlines thus had members of two unions (ALPA, representing the pilot and co-pilot positions, and FEIA, representing the flight engineer position) on the flight deck. In the trial commissioner's words, this "situation set the stage for the battle between FEIA and ALPA over representation of the flight engineer position out of which this case emerged."

As of January 1961, flight engineers generally had become concerned about the future. The normal aircraft flight deck crew complement at the time was three persons. ALPA, the bigger of the two unions, had, however, taken the position that the entire flight deck crew of a jet aircraft should be pilot qualified. As a result of ALPA's pressure, by January 1961 several major airlines, including Western, were flying pure jet aircraft with a four-man crew. In addition to the traditional two pilot-qualified persons and a flight engineer, the crew also included a third pilot who had no real duties to perform. Since a three-man crew was sufficient for safe flight, the likelihood that a more economical, but equally safe and efficient, arrangement would eventually be adopted by the airlines was obvious to everyone.

One possible solution to what became known as the crew complement problem was a merger between ALPA and FEIA,

both of which were members of AFL–CIO. Indeed, in 1960, shortly prior to the expiration of FEIA's contract with the major airlines, FEIA had explored the possibility of merging with ALPA. FEIA was told, however, that in the event of such a merger flight engineers, even if pilot-qualified, would, without regard to seniority, be placed in the lowest seniority ranks of ALPA, behind even the most junior of ALPA's pilot members. This hardly represented a satisfactory solution from the standpoint of a flight engineer.

United Airlines had offered pilot training to its flight engineers since 1954; moreover, United had made the flight engineer position a training position for its co-pilot and pilot positions. As a result, most of United's flight deck personnel were pilots. On January 20, 1961, shortly after the expiration of FEIA's contract with Western, Western announced that as of July 1, 1961, all flight engineers on its jet aircraft would have to have a pilot's license and an instrument rating. Western also then offered, however, to provide its flight engineers the training necessary to meet that requirement on company time and at company expense.[7]

In the meantime, on January 17, 1961, a committee appointed by the National Mediation Board (NMB), which on petition of ALPA had been considering a craft or class dispute concerning United Airlines, had recommended to the NMB that for the purpose of electing a bargaining representative under the Railway Labor Act, 45 U.S.C. § 152 (1976), United's three flight deck positions should be represented by a single union. Western's flight engineers, and indeed flight engineers at other major airlines generally, were concerned that a similar ruling might be made as to their situation, and (because ALPA was a far larger union than FEIA) about the continued existence of both their union and their jobs as flight engineers.

---

**7.** On January 26, 1961, Western announced that exact dates for the training would be set in the near future. Because of ensuing events, none of the plaintiffs actually began pilot training.

On Friday evening, February 17, 1961, flight engineers at Pan American World Airways began a wildcat strike to protest the January 17, 1961, recommendation referred to above. The strike, aimed at forcing the NMB to reject the recommendation, was not authorized by FEIA or its officers, but it quickly spread to six other major airlines (including Western, which then employed 133 flight engineers).[8] All of the 122 plaintiffs in this reference joined in the strike. The impact of the strike was considerable. In essence, it almost completely shut down the flight operations of seven major airlines, and caused severe inconvenience to the traveling public.

Western attempted to continue flying after the walkout. And, it promptly took actions designed to help it achieve that end. On Saturday, February 18, 1961, Western obtained a temporary restraining order (TRO) directed to FEIA's Western Chapter (to which all of the plaintiffs belonged) enjoining the strike by its flight engineers. On (or shortly after) that same day, Western also instructed each person employed by it as a flight engineer to report for duty at the time he was regularly scheduled to do so.

The TRO was promptly served on the president of FEIA's Western Chapter, and on Sunday, February 19, 1961, he sent to each member of the Chapter a telegram stating that the TRO had been issued, and advising a return to work. Some of Western's flight engineers did not receive such a telegram until after they had (for reasons to be stated) already been discharged by Western. In any event, however, the advice to return to work was not followed by any plaintiff, and the proof justifies the conclusion that an earlier receipt of the telegram would not have changed any plaintiff's course of action (or inaction).

By Monday, February 20, 1961, Western had decided to terminate the services of any flight engineer who refused to fly an assigned trip, and had begun to implement that policy. On the refusal of a flight engineer to report for work when due to do so, Western discharged him.[9] On February 20, 1961, Western moved for leave to withdraw its complaint in the action in which the TRO had been issued two days earlier, and began employing and training pilot-qualified flight engineers to replace those who had been discharged.[10]

In the meantime, the government began vigorous efforts designed to explore the underlying problems that had led to the walkout, and to end the resulting nationwide tie-up in air transportation. Over a period of several days, Secretary of Labor Arthur J. Goldberg conferred extensively with representatives of six of the seven struck airlines (American, Eastern, Flying Tiger, National, Pan Am, and Trans-World),[11] and with representatives of both FEIA and ALPA.

On the afternoon of February 21, 1961, Secretary Goldberg issued a statement urging the striking flight engineers to return to work; stating that he had recommended to the President the appointment of a commission to explore the "complex problems" involved and make findings and recommendations; and reflecting that he had obtained the assurance of the "struck carriers" that if the flight engineers promptly re-

---

**8.** In addition to Pan American and Western, American, Eastern, the Flying Tiger Line, National, and Trans-World Airlines were affected by the walkout.

**9.** Any Western flight engineer who was authorized to be away from work (on vacation, on sick leave, or for any other reason) immediately following February 17, 1961, was discharged only if, when scheduled to report for duty, he failed or refused to do so. The record indicates that some of the plaintiffs were not discharged until March 1961.

**10.** By February 28, 1961, Western had employed a substantial number of such flight engineers.

**11.** As Secretary Goldberg put it on February 22, 1961, he was for a time "unable to communicate with [Western] in reference to this matter." When Secretary Goldberg subsequently did reach Western, Western refused to give him the "assurances that I asked of * * * and received from the other carriers * * *."

turned to work no disciplinary action would be taken against them.[12]

Also on February 21, 1961, pursuant to Secretary Goldberg's recommendation, the President issued Executive Order No. 10921, establishing a three-man commission to investigate and inquire into the flight engineer controversy (including "related representation rights of the unions," *i.e.*, FEIA and ALPA) on six of the seven struck air carriers (not including Western). The commission (chaired by Professor Nathan Feinsinger) was authorized and directed to look into the crew complement problem and to report its findings and recommendations to the President.

Despite requests by the government that the striking flight engineers return to work, those employed by the six airlines named in Executive Order No. 10921, who could have returned to work at that time, then failed to do so. This failure was attributed by the trial commissioner to the fact that neither the agreements sought (and obtained) by Secretary Goldberg nor Executive Order No. 10921 covered Western's flight engineers, and that finding is not here challenged.

On February 23, 1961, however, the strike that had begun some six days earlier was effectively ended. The promulgation of Executive Order No. 10922, February 23, 1961, amending Executive Order No. 10921 "to include Western Air Lines within the mentioned air carriers," [13] and a conference call that same day involving Secretary Goldberg, Undersecretary Wirtz, Professor Feinsigner, FEIA's officers, and the president of the FEIA Chapter at each of the seven struck airlines, contributed to the decision of the flight engineers to return to work at six of the seven struck airlines.[14]

The amendment of Executive Order No. 10921 was announced by Secretary Goldberg at a White House press conference on February 23, 1961. During that conference, Secretary Goldberg also referred to a just concluded agreement, communicated to the striking flight engineers by FEIA, pursuant to which they "could promptly return to work without prejudice to the position of either the carriers, or the pilots, or the engineers, during the 90-day period in which the Commission is authorized to do its work and make its study," and to a "return to work which is taking place right at this present moment * * * at all airlines except Western * * *."

The decision of the flight engineers to return to work (except at Western) followed, and was essentially based upon, the conference call mentioned above. That conference call (and what was said during it) are central to the validity *vel non* of the trial commissioner's conclusions respecting this reference. Accordingly, the facts concerning that call must be considered carefully, in order to determine whether they justify those conclusions.

To place the matter in perspective, the strike had been in process for nearly a week at the time of that conference call. The earlier assurances of six of the seven struck air carriers that no disciplinary action would be taken against the striking flight engineers, provided they returned to work promptly, had not led to a return to work. Western had consistently refused to agree to rehire the flight engineers it had fired, and (to the flight engineers' knowledge) still refused on February 23, 1961, to accede to the government's request that it offer the flight engineers the same assurances as had the other six struck airlines. The six struck carriers had made it clear by Febru-

---

12. Western did not give him any such assurances. Prior to February 21, 1961, Western had decided upon, and had begun to implement, the firing (and hiring replacements) policy described above, and declined to accept the Secretary's proposal of a return to the pre-walkout status quo with no disciplinary action to be taken against those flight engineers who had walked out.

13. In announcing the amendment, Secretary Goldberg made it clear that Western still had not given him the assurances given to him by the six other affected carriers.

14. That the assurances theretofore offered by these six carriers would, unless accepted immediately, be withdrawn was, however, also a contributing factor.

ary 23, 1961, however, that the assurances they had offered to the flight engineers (provided they returned to work promptly) would, unless immediately accepted, be withdrawn.

Just prior to, and during, the conference call, those who participated in the call on behalf of either FEIA as such or any of its Chapters were aware of the situation at Western, and they were concerned about that situation. The government officials involved in the herculean effort to get the nation's airlines flying again were also concerned about the situation at Western, and indeed about all of the striking flight engineers, including those who had been discharged by Western.

In finding that the government was able, during the February 23, 1961, conference call, to convince the presidents of the several striking Chapters that it would be in their best interests to get their members back to work, the trial commissioner accurately interpreted the record. His further finding that the government then intended to, and indicated to the flight engineers that it would, do everything legitimately within its power to persuade Western to reemploy the flight engineers it had fired is also impeccable.

The trial commissioner also found, however, that just prior to the February 23, 1961, conference call, Undersecretary Wirtz told FEIA officers that the government would "make sure that the WAL flight engineers would get back to work"; that during the conference call Undersecretary Wirtz offered his "personal assurances" (and those of President Kennedy and Secretary Goldberg) that the government could and would "see that the Western Chapter went back to work," and "would see that it was done"; [15] and that Professor Feinsinger, as a government representative, told the president of the Western Chapter that if the Western Chapter "let the other flight engineers go back to work," notwithstand-

ing the situation at Western, "I will take care of you." [16]

The trial commissioner went on to state that Undersecretary Wirtz' and Professor Feinsinger's representations "clearly implied that the government would use the powers of the [Civil Aeronautics Board] and the [Federal Aviation Agency] as well as the powers of verbal persuasion to help get the [plaintiffs] back to work"; that the said "representations amount to promises that the government would legitimately influence the CAB and FAA to make rulings favorable to * * * plaintiffs"; that it was "reasonable to expect that" governmental "lobbying efforts" on behalf of plaintiffs before the CAB and FAA would have been successful; and that the government, which admittedly did not attempt any such "lobbying efforts," breached a "moral obligation * * * to back up its promise * * * that defendant would take care of * * * " plaintiffs.

The findings and conclusions stated in the preceding two paragraphs underpin and are crucial to, the trial commissioner's ultimate conclusion that plaintiffs have a valid equitable claim; and they are vigorously, and validly, excepted to by defendant.

Upon a careful and complete study of the record, the Review Panel is of the view that plaintiffs have failed to prove, by a preponderance of the competent and credible evidence, that during the conference call of February 23, 1961, or otherwise, there were (in the words of H.R. 1394) any "Government assurances that [plaintiffs] would be reinstated [by Western] without reprisal * * *." Nor does the record, properly viewed, establish that any government official ever promised plaintiffs (or anyone else) that it either could or would endeavor, by "lobbying efforts" in plaintiffs' behalf before the CAB and FAA, to force Western to rehire them. In short, the proof does not show that defendant made a "promise * * *

---

15. Undersecretary Wirtz concededly refused to "guarantee" that Western would rehire plaintiffs.

16. As will be seen, in April 1961 Professor Feinsinger flatly asserted that no assurances were given that Western would rehire plaintiffs. In June 1961, Secretary Goldberg also so asserted.

that defendant would take care of * * * " plaintiffs.

The preponderance of the competent and credible evidence is that during its efforts to get the airlines flying again, the government did assure FEIA and its individual chapters (including plaintiffs) that it would continue to exert every *reasonable* effort to persuade Western to reemploy plaintiffs; that, as the trial commissioner put it, defendant would use "all legitimate means at its disposal" to this end. But, the government did not—indeed, it could not properly—promise plaintiffs, or anyone else, that it would exert pressures on independent federal regulatory agencies directed toward obtaining a decision by Western to reemploy those plaintiffs it had fired (and legally so) for failure to report for work when due to do so, or otherwise "take care of" them by getting their jobs back.

In a letter, dated April 28, 1961, to FEIA's president, Professor Feinsinger made it emphatically clear that the government had not "guaranteed" that Western would rehire plaintiffs, in these words: [17]

> While the Government could give no guarantee [that Western would rehire plaintiffs], it assured your Association that it would continue every reasonable effort to persuade Western to reinstate

its flight engineers. This assurance has been and is being kept. * * *.[18]

While Professor Feinsinger was unable to testify in this reference, his 1961 letter is in evidence. It is, however, unnecessary to rest conclusions on that letter *per se*, for it no more than states concisely what the preponderance of the competent and credible evidence in the record as a whole independently establishes in any event: that the government's representations to plaintiffs were essentially that it would make all reasonable efforts to persuade Western to reemploy plaintiffs,[19] but could not make any commitment that it would succeed.

In concluding that governmental representations extended much further, however, and both "clearly implied," and amounted to promises that, "lobbying efforts" on behalf of plaintiffs, before independent federal regulatory agencies, would also be taken, the trial commissioner erred. That conclusion lacks any proper evidentiary support. Moreover, any such "promise," if made, would scarcely "have to be implied" at this very late date; its existence and breach would have been trumpeted loudly in and shortly after 1961.

Parenthetically, even were the record sufficient to show that defendant had promised that it would engage in "lobbying efforts" for plaintiffs before the CAB or the

17. Professor Feinsinger also noted that during the February 23, 1961, conference call the government representatives had made it "perfectly clear * * * that *if the strike were to continue* on the other airlines the flight engineers ran the risk of seven Western situations instead of one. In other words, not only would the Western Air Lines flight engineers remain discharged but the *flight engineers on the other airlines, according to the announced deadline of the latter carriers, would also face discharge* * * *." (emphasis supplied)

18. By the time of trial of this reference in 1979, Professor Feinsinger had become physically incapable of appearing as a witness. The trial commissioner's conclusions on the merits of the reference omit any mention of the April 28, 1961 letter; it is mentioned (albeit not quoted) only in connection with rejection of defendant's plea of laches.

19. *E.g.*, the record contains a letter, dated June 1, 1961, from Secretary Goldberg to the wife of one of the plaintiffs, stating in part that "I did

not make any commitments about returning the Western engineers to work because I could not promise to do something that was beyond my power or that of the President." In January 1962, one of the plaintiffs conceded that "the Government did not promise that our jobs would be returned * * *," and in March 1962 that same plaintiff advised Secretary Goldberg that "We don't want anyone to think the government *guaranteed* our reinstatement or that they could direct same. We realize these two facts." (emphasis in original). In a 1965 report, Professor Feinsinger stated that the flight engineers who returned to work in February 1961 did so "with the understanding that the Government would do all in its power to secure relief for the discharged flight engineers but could make no commitment." And, in 1967, four FEIA chapter presidents stated that the government had "promised to lend all possible support" to including plaintiffs as "part of the overall Crew Complement solution * * *."

FAA, the Review Panel still could not agree with the conclusion that "[g]iven the proper circumstances, it is reasonable to expect that such lobbying efforts would have been successful." Pretermitting the problem of identifying any "circumstances" that might be deemed "proper" in this context, the record falls far short of justifying the reasonableness of any expectation that plaintiffs would have benefited therefrom. The trial commissioner's conclusion otherwise rests only on speculation.[20]

As the trial commissioner found, but for the government's promises to the flight engineers during the February 23, 1961, conference call, the walkout undoubtedly would have continued. The fact is, however, that the government's promises—not nearly so extensive as the trial commissioner viewed them—nonetheless led the flight engineers (including plaintiffs) to the conclusion that the walkout should be ended, and that those who could do so should go back to work. To any extent that the trial commissioner's report may imply that but for the making of promises, as the trial commissioner defined them, the walkout would have continued (or resumed at a later time), the Review Panel is unable to agree.

The question remains, however, whether the governmental assurances that *were* made were fulfilled at least adequately enough to satisfy any moral or equitable obligations defendant may have owed to the plaintiffs in this reference under all the existing circumstances, or whether, instead, there is something to be said for upholding plaintiffs' contention that a breach of promise should be held to create an equitable claim. This inquiry is to be resolved in favor of defendant.

More specifically, the government unquestionably intended to (and indicated to

FEIA and the president of FEIA's Western Chapter during the February 23, 1961, conference call that it would) use all proper means at its disposal to endeavor to persuade Western to rehire the flight engineers Western had discharged because of the strike and its immediate aftermath. Those assurances were truthfully and honestly given. And it is equally certain that the government did endeavor, and vigorously, to persuade Western to reemploy the discharged flight engineers.[21] That those efforts were not successful is attributable to Western's continued intransigence toward those former employees who had participated in the strike, not to any lack of effort, or breach of promised effort, by defendant.

Plaintiffs obviously were (and still are) exceedingly dissatisfied with the results of the efforts exerted by the government on their behalf, and it is an easy step from that attitude to condemnation of the efforts themselves. It seems clear that anything short of a decision by Western to reemploy them would not have satisfied plaintiffs, and that decision was, of course, not one the government had any power, or right, to make. And, the absence of lobbying efforts aside, the trial commissioner obviously did not view the government's efforts as sufficiently vigorous ones. The Review Panel sees the matter differently.

The government officials who dealt with Western repeatedly tried, as the government had promised it would, to persuade Western that reemployment of the discharged flight engineers was appropriate. Moreover, in its May 24, 1961, report, the Feinsinger Commission strongly recommended that Western rehire them. And, in a 1965 report, prepared as a result of another appointment in October 1961 to look into and report on the Western situation, Pro-

---

**20.** Indeed, he elsewhere recognized as much, noting that whether a governmental "lobbying effort with the CAB and FAA would have been successful," and whether, even "if successful, the actions would have convinced Mr. Drinkwater to rehire the plaintiffs," were "unclear, of course."

**21.** As the trial commissioner found, Western's president (and the president of the Western

Chapter of FEIA) in fact believed that there was a "plan of government pressure," from 1961 through at least 1964, aimed at getting Western to rehire plaintiffs, or punishing it for not doing so. While the record does not show that that particular belief was a justified one, it *does* show repeated and vigorous (albeit ineffective) government efforts to influence Western in plaintiffs' behalf.

fessor Feinsinger continued to sympathize with the discharged flight engineers, if to no avail. This is simply not a situation where a promise was made, a desired result obtained, and the promise then forgotten.

In sum, the government's efforts to live up to its promises were (if unsuccessful) both reasonable and sufficient to satisfy any equitable or moral obligations owed to plaintiffs with respect to their possible reemployment by the employer that had fired them for a failure and refusal to report for work when due to do so.[22]

In the light of the foregoing, it is concluded that plaintiffs have failed to establish that any government representations that they would be reemployed by Western were ever made, or that any representations that actually were made to them by the government were not satisfied. Accordingly, the Review Panel is of the opinion that plaintiffs do not have a legal or equitable claim against the United States in consequence of the February 17, 1961, strike and the events that followed it, and that any payments upon the claims here advanced would be a mere gratuity.

### III

Defendant proffers a number of other contentions in support of its overall claim

that the trial commissioner's findings and conclusions herein are erroneous.[23] In light of the conclusions reached hereinabove, it is neither necessary nor desirable to treat all of these contentions. The matter of laches, does, however, deserve passing mention.

In rejecting defendant's argument that the claims herein are barred by laches, the trial commissioner held (among other things) that the government had failed to show that it had been "actually prejudiced by either the passage of time or the unavailability of Prof. Feinsinger" as a witness at trial.[24] Were it essential to a just decision here that the Review Panel resolve the question, the government's vigorous and persuasive objections to the trial commissioner's conclusions in this respect would be upheld.[25]

■ In general terms, laches, an equitable defense resting on considerations of fairness, and involving the concept of flexibility, denies relief to one who has "unreasonably and inexcusably delayed in the assertion of a claim," if the delay has resulted in any injury or prejudice to the party against whom the claim is asserted. *Deering v. United States,* 223 Ct.Cl. 342, 347, 620 F.2d 242, 244 (1980); *see also Carruth v.*

---

**22.** No court or agency has ever held (and plaintiffs do not here suggest) that plaintiffs' discharges were in any way legally flawed. Moreover, there is neither contention nor evidence that any plaintiff *"refrained from filing [a grievance] or taking other action concerning the termination of [his] employment by Western Airlines"* in reliance upon any government promise that "[he] would be reinstated without reprisal." *Cf.* H.R. 1394, 95th Cong., 1st Sess. (emphasis supplied). The essence of plaintiffs' position is, rather, that they acquiesced in the return to work of other striking flight engineers in reliance upon an asserted government promise that they too would get their jobs back, that they were not reemployed by Western, and that *defendant* is therefore equitably obligated to pay substantial sums of money to them.

**23.** Among others, that since the February 17, 1961, strike was "illegal," "plaintiffs do not come before this forum with 'clean hands' "; that plaintiffs have no "equitable" claim against the United States as that kind of claim has been elsewhere defined (*see, e.g., The Innocent Victims of the Occupation of Wounded*

*Knee South Dakota v. United States,* Cong.Ref. No. 4–76 (opinion of trial commissioner, filed June 10, 1981, pp. 31–33), affirmed December 15, 1981, 229 Ct.Cl. ——; *Wong v. United States,* Cong.Ref. No. 3–74 (Report of Review Panel, filed May 16, 1979, synopsis at 220 Ct.Cl. 750, 751)); that the claims are barred by laches; and that the trial commissioner exceeded the scope of the reference.

**24.** By the August 1979 trial of this reference, Professor Feinsinger's physical health had deteriorated to the point where he was wholly unable to testify. Some months earlier, in the advanced stages of Parkinson's Disease, and manifesting the customary symptoms of that disease to a marked degree, he had been admitted to a nursing home as a full-time resident.

**25.** While the Review Panel does not agree with all of the trial commissioner's general comments respecting limitations and laches, there is no need to explore that aspect of the matter here.

*United States,* 224 Ct.Cl. 422, 431, 627 F.2d 1068, 1073 (1980). While the passage of time alone is normally an insufficient predicate for barring a claim on the ground of laches, the greater the lapse of time in asserting a claim, the less need there is to show specific prejudice to the party against whom the claim is made. *Eurell v. United States,* 215 Ct.Cl. 273, 280, 566 F.2d 1146, 1150 (1977); *Gersten v. United States,* 176 Ct.Cl. 633, 636, 364 F.2d 850, 852 (1966).

The events with which this reference is basically concerned occurred in early 1961. Not until July 29, 1975, was private relief legislation on behalf of plaintiffs offered in Congress. H.R. 9027, 94th Cong., 1st Sess., 121 Cong.Rec. 25599, July 29, 1975. No explanation why this source of potential relief was not pursued earlier has been offered, or appears. There has been, most assuredly, a long delay, and one not demonstrated to be either reasonable or excusable, in the presentation of these claims for equitable consideration under Sections 1492 and 2509. And, those provisions were as available in, and at all times after, 1961 as they were in the 1975–1978 period.

Moreover, the trial commissioner's conclusion that "defendant has clearly not been prejudiced" by Professor Feinsinger's inability to testify is not a persuasive one. Professor Feinsinger was one of the participants in the conference call of February 23, 1961, and his alleged oral assurances that he would "take care of" plaintiffs were substantially relied upon here, to defendant's detriment.[26] His clear and practically contemporaneous statement to FEIA that plaintiffs were given only an assurance that the government "would continue every reasonable effort to persuade Western to reinstate its flight engineers" is contrary to the factual conclusions actually reached by the trial commissioner.

In all the circumstances, it would be very difficult to hold that notwithstanding the long and unexplained delay attendant upon presentation of the claims for consideration, and the loss, during such delays, of Professor Feinsinger's testimony,[27] the claims are not barred by laches. *Eurell v. United States, supra; Johnstone v. United States,* Cong.Ref. No. 1–73 (opinion of trial commissioner, filed May 15, 1978, pp. 30–31), affirmed October 2, 1978, 218 Ct.Cl. 628.

## IV

The issue in this reference is *not* whether or not plaintiffs have a legal or equitable claim against *Western* because Western fired them in early 1961, and thereafter persisted in refusing to rehire them. Whether, if Western were a defendant in the reference, the Review Panel might recommend relief against it, is wholly irrelevant here. So, too, is the fact that plaintiffs were treated more harshly by Western than other flight engineers, employed by other airlines, who did not lose their jobs for taking part in the February 17, 1961, strike.

The issue *is* whether or not plaintiffs have any valid legal or equitable claim *against the United States.* The Review Panel concludes that the answer to that issue is no, and that any payments to plaintiffs pursuant to the reference would amount to a gratuity.

---

**26.** The trial commissioner's opinion twice purports to quote, and to reflect as fact, Professor Feinsinger's alleged guarantees that he would "take care of" plaintiffs, provided they "let them [the other flight engineers] go back" to work.

**27.** Indeed, by the time of the reference, Secretary Goldberg, Undersecretary Wirtz, and other government officials who had dealt with the strike, understandably had little or no recollection of the events of February 17–23, 1961. Memories can and do fade, particularly over a period of a great many years.