**Richard V. KANEHL, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–647X.**

United States Court of Federal Claims.

May 14, 1997.

---

Lawrence M. Farrell, for plaintiff, with whom were Patrick O'Keefe and Alyssa T. Senzel, McKenna & Cuneo, Washington D.C., and Michael La Place, Baton Rouge, LA, of counsel.

Andrea I. Kelly, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom on brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Richard E. Rice, Assistant Director.

## OPINION

MARGOLIS, Judge.

This congressional reference case is before the Court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. Plaintiff requests that this Court grant summary judgment solely on the issue of liability. In plaintiff's brief, however, plaintiff does not argue why the government is

liable to the plaintiff, other than to assert that the government is bound by the factual determinations in a prior congressional reference proceeding. At the same time, however, plaintiff asserts in his motion that he is not asking this Court to determine the liability of the government based upon the result in the prior congressional reference in *Merchants Bank*. In sum, then, plaintiff is asking this court to rule that the factual findings of *Merchants Bank* are binding upon the parties to this congressional reference and that, therefore, the government is liable to the plaintiff as a matter of law—or at least based upon the standards that guide congressional reference determinations. Defendant has also moved for summary judgment.

## BACKGROUND [1]

Dri–Mix Products Corporation ("Dri–Mix") was founded in 1970. The principal officers of Dri–Mix were Richard Kanehl, the President, and Richard Williams, the Vice–President. Initially, Dri–Mix was established to market a beverage base powder but, by the end of 1974, Dri–Mix's principal sources of business were government contracts. Those contracts were almost exclusively awarded by the Defense Personnel Support Center, a field activity of the Defense Logistics Agency ("DLA"), and required Dri–Mix to provide packaged processed foods. During the period 1970 through 1975, Merchants National Bank was Dri–Mix's primary source of start-up financing. Dri–Mix performed all its government contracts from 1970–75 in a satisfactory manner.

On May 19, 1976, DLA issued a solicitation for the final assembly of 2,987,165 boxes of "Meal, Combat, Individuals" ("MCI"). MCIs are essentially successor to "C-rations" previously used by the United States government. Pursuant to the terms of the DLA solicitation, the contractor would be required

---

1. The factual background is taken from two prior congressional reference cases, *Merchants National Bank of Mobile v. United States*, 5 Cl.Ct. 180 (1984) ("*Merchants I*") and *Merchants National Bank of Mobile v. U.S.*, 7 Cl.Ct. 1 (1984) ("*Merchants II*"). In those actions, this Court recommended that the equitable claim of Merchants be allowed. 5 Cl.Ct. at 218–19, 7 Cl.Ct. at 13. In

*Merchants I*, the hearing officer made extensive findings of both fact and law. In *Merchants II*, a review panel consisting of three judges from this Court approved the legal and factual findings of the hearing officer in *Merchants I* and incorporated the hearing officer's findings in their Report of the Review Panel to the United States Senate.

to assemble 41 different prepackaged items into individual MCIs, package the MCIs into cases, place the cases on pallets, and load the pallets onto railroad cars. The government would supply the contractor with the 41 items as "Government Furnished Materials" ("GFM"). On July 19, 1976, Dri–Mix was awarded a government contract in the amount of $4,368,986. In 1976, Dri–Mix was also awarded two additional contracts for a cocoa beverage mix and an "accessory pouch," respectively.

The MCI contract required the DLA to supply, at set intervals, 20 percent of each component to be incorporated into the MCIs. Upon assembling each portion of GFM into MCIs and delivering the MCIs, Dri–Mix was to be paid for that segment. Once Dri–Mix financed the initial production run, Dri–Mix planned to use the income from each subsequent production run to finance additional production runs. Dri–Mix estimated that its initial start-up costs would be $200,000–$300,000. Merchants National Bank ("Merchants") was to be Dri–Mix's primary source of financing for the start-up costs.

As is often the case with the most carefully laid plans, things did not go as Dri–Mix had anticipated. DLA failed to deliver the GFM in a timely and orderly manner, as had been contemplated in the MCI contract. Although Dri–Mix eventually received all or substantially all of the components to assemble the MCIs, there were substantial delays with the meat components. Without the meat components, Dri–Mix could not begin production and assembly of the MCIs. Though not the fault of Dri–Mix, as a result of the delays the delivery dates for the contract had to be amended and extended on several occasions. As a result of what was likely a government breach of the MCI contract due to the delays and the unequal shipment of GFM, Dri–Mix was forced to expend large sums of money for extra warehouse space, demurrage charges, and labor costs. Further, because Dri–Mix could not assemble the MCIs, Dri–Mix was not receiving progress payments to finance further operations or pay its current costs. The costs of the delay and the absence of any incoming cash flow eventually outstripped both Dri–Mix's estimated start-up costs and its available line of credit.

At the same time Dri–Mix was experiencing difficulties in its contractual relationship with DLA, Merchants advised Dri–Mix that it would not extend credit beyond a $500,000 ceiling. Because Dri–Mix's costs were exceeding its available line of credit from Merchants, Dri–Mix sought a government guaranteed V–Loan to obtain additional capital through Merchants. Assurances by the government that the V–Loan would be approved encouraged Merchants to continue to extend financing to Dri–Mix during the V–Loan application process. Most of Dri–Mix's need for additional financing was due to the delivery problems caused by the government. The loan guarantee was subsequently approved by the DLA and the Federal Reserve Bank of Atlanta (hereinafter "Fed") which, acting as fiscal agent for DLA, entered into the first V–Loan agreement ("V–Loan I") with Merchants.

Dri–Mix could assemble MCIs at only one-third of the rate it had anticipated once production started. The slow rate of production was, in large part, due to the uneven and delayed delivery of GFM by the government. The slow production, in turn, resulted in the need for Dri–Mix to secure additional financing. On May 20, 1977, DLA, Merchants, the Fed, and Dri–Mix entered into an agreement modifying the terms of V–Loan I. The modified agreement provided for a government guarantee on 85 percent of $1,600,000 at ten percent interest, and an unguaranteed credit line of $300,000.

When over $1,584,000 of the amended V–Loan had been advanced by Merchants, the DLA revoked the loan guarantee contending that Congress had not appropriated funds for the V–Loan. General counsel for the DLA, Karl Kabeiseman, informed Merchants that there had been no authority to enter into V–Loan I and that the V–Loan was, therefore, void. There was a clear understanding between Kabeiseman and the director of the DLA, however, that the director wanted Dri–Mix to continue production of MCIs. Merchants was, in fact, encouraged to continue financing Dri–Mix. Upon assurances from DLA that an amendment to the Defense

Appropriations Act would solve the problem of the void V–Loan, Merchants continued to finance Dri–Mix.

Congress then appropriated $5 million for V–loans. Merchants applied for a new V–Loan ("V–Loan II") in the amount of 85% of $2.6 million at 10% interest, expecting DLA to act in conformity with the assurances it had provided to both Merchants and to Dri–Mix. The increase in requested guarantees was commensurate with the increased financing extended to Dri–Mix by Merchants, based upon DLA assurances that a new and valid guarantee was imminent. By this time, however, Dri–Mix had produced a substantial number of MCIs, and DLA no longer had an urgent need for a large number of additional MCIs. Despite the $5 million appropriated by Congress, and prior assurances by DLA that loan guarantees would be forthcoming, DLA refused Merchants' requested guarantee. DLA announced to Merchants that it would guarantee only 55% of $2 million ($1.1 million). Merchants accepted the DLA "take-it-or-leave-it" offer under duress, realizing that the alternative was the immediate bankruptcy of Dri–Mix.

In January 1978, after failing to acquire loan guarantees that would enable Merchants to finance Dri–Mix properly, Merchants became concerned with Dri–Mix's ability to meet its payroll and requested that DLA increase its V–Loan guarantees. Merchants then decided to cease further extensions of credit to Dri–Mix until such time as DLA provided further loan guarantees. Thereafter, Dri–Mix was unable to meet its payroll and filed for Chapter XI reorganization under the bankruptcy laws. Merchants and Dri–Mix attempted to work with DLA to develop a satisfactory plan by which Dri–Mix could continue to produce MCIs. On April 28, 1978, Dri–Mix was adjudicated bankrupt under Chapter XI. On May 2, 1978, Dri–Mix's remaining contracts were terminated for default.

Subsequently, Dri–Mix's trustee in bankruptcy made a timely appeal of the terminations for default to the Armed Services Board of Contract Appeals (ASBCA). The value of these claims was approximately $4.6 million. DLA filed a counterclaim for $5,858,573. Ultimately, DLA withdrew its counterclaim and agreed to a gross settlement of $1.7 million with Dri–Mix's trustee in bankruptcy. DLA actually paid the trustee $880,000, the balance of the $1.7 million withheld from the trustee representing the DLA's claimed share as creditor under the loan guarantee, Dri–Mix's unpaid fees to the United States Department of Agriculture, and Dri–Mix's tax liability to the Internal Revenue Service.

Shortly thereafter, Merchants recovered $1.1 million due under the terms of V–Loan II. Merchants also received $317,500 from the Dri–Mix trustee in bankruptcy. In conjunction with the aforementioned payments, and by the terms of a settlement agreement between the government and the trustee in bankruptcy, Merchants reserved the right to pursue relief in a congressional reference case. Under the terms of the settlement agreement, if Merchants recovered what it sought in the congressional reference proceeding, it could receive nothing further from the Dri–Mix funds held by the trustee in bankruptcy. If Merchants recovered less than the amount claimed in the congressional reference proceeding, it would receive a relatively small dividend from the trustee, as one of a number of unsecured creditors, in accordance with a formula set forth in the settlement agreement. In no circumstance could Merchants receive in the aggregate more than it sought in the congressional reference proceeding.

In *Merchants I*, the hearing officer recommended that Congress authorize payment to Merchants the sum of $809,609, in full settlement of all its legal and equitable claims against the United States. In *Merchants II*, in accordance with congressional reference procedures, a panel of three Court of Federal Claims judges affirmed the recommendation of the hearing officer. The review panel then recommended that the chief judge advise Congress that Merchants had an equitable, but not legal, claim against the government for $809,609, and that the payment to the plaintiff would not constitute a gratuity. Finally, the review panel noted that recovery by Merchants in the congressional reference

proceeding would preclude further recovery by Merchants in bankruptcy court.

Plaintiff alleges that, in August 1983, plaintiff had approached Merchants and requested that Merchants permit Dri–Mix to join their congressional reference proceeding.[2] Unsuccessful, plaintiff alleges that he then contacted Senator Denton of Alabama to request that the United States Senate enact a resolution referring a bill for the relief of Dri–Mix to the Claims Court. Plaintiff represents that he continued his efforts to have a reference resolution passed in either the United States House of Representatives or the United States Senate for fifteen years.

On September 21, 1993, the United States Senate passed Senate Resolution 108, referring S. 974, entitled "A bill for the relief of Richard Kanehl of Mobile, Alabama,"[3] to the chief judge of the United States Court of Federal Claims. S. Res. 108, 103d Cong., 1st Sess. (1993). On October 4, 1994, the United States Senate passed Senate Resolution 258 as a supplement to Senate Resolution 108. S. Rep. 258, 103d Cong., 2d Sess.(1994), U.S.Code Cong. & Admin.News 1994, 2561, 140 Cong. Rec. S14077 (1994). The supplemental resolution, S. 258, requests the chief judge of the Court of Federal Claims to consider S. 974 "in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, notwithstanding the bar of any statute of limitations, laches, res judicata, collateral estoppel, or the bar of sovereign immunity, and report thereon to the Senate, at the earliest practicable date, giv-

ing such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, if any, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due to the claimants from the United States." *Id.* Senate Resolution 258 further provides that, in complying with this resolution, the Court of Federal Claims should consider the records of any previous trial of the issues in this case, including the records of *Merchants National Bank v. United States,* 7 Cl.Ct. 1 (1984).

## DISCUSSION

The present congressional reference case arises pursuant to 28 U.S.C. § 1492 (1996), which provides that a bill may be referred by either house of Congress to the chief judge of the Court of Federal Claims for a report in conformity with 28 U.S.C. § 2509. Under § 2509, a congressional reference case is then assigned by the chief judge to a judge as hearing officer. 28 U.S.C. § 2509(a). Section 2509 further provides that the hearing officer to whom the congressional reference case is assigned "shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal

---

**2.** Although plaintiff originally represented to the court that he approached Senator Heflin about pursuing a Congressional reference case in 1978, plaintiff withdrew that representation at oral argument. Tr. at 10.

**3.** S. 974 provides:

For the relief of Richard Kanehl of Mobile, . Alabama.

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. The Secretary of the Treasury shall pay, out of any money in the Treasury not otherwise appropriated, the sum of $6,563,000 to Richard Kanehl of Mobile, Alabama, for damages incurred by the said Richard Kanehl and the Dri–Mix Products Corporation of Mobile, Alabama, when such corporation incurred involuntary bankruptcy under chapter 7 of title 11, United States Code, resulting from the ter-

mination of three related contracts with the Federal Government.

SECTION 2. (a) The payment made pursuant to the first section of this Act shall constitute full settlement of all legal and equitable claims by Richard Kanehl of Mobile, Alabama, against the United States.

(b) Nothing in this Act shall be construed as an inference of liability on the part of the United States.

SECTION 3. No part of the amount appropriated in this Act in excess of 10 percent thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this Act, and the same shall be unlawful, any contract to the contrary notwithstanding. Violation of the provisions of this section is a misdemeanor punishable by a fine not to exceed $1,000.

remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c).

## I. Parties to Congressional Reference Proceedings

■ The Court's obligation in this action is founded on 28 U.S.C. §§ 1492 and 2509. "Language added or omitted in the reference resolution, or addition of supplementary language by one House of Congress at the time the reference resolution is under consideration, does not have the force and effect of an amendment to the basic law. It can neither add to nor subtract from the requirements of the reference statute." *Sneeden v. United States,* 33 Fed.Cl. 303, 308–09 (1995); *Paul v. United States,* 20 Cl.Ct. 236, 266, *aff'd,* 21 Cl.Ct. 758 (1990). As such, in this congressional reference, the Court must ascertain whether plaintiff has presented sufficient evidence to support a claim for legal or equitable relief for Richard Kanehl, or whether relief would be a gratuity. Although plaintiff in this case has added the names "Dri–Mix Group (Rev. David Barney, A.D. Barrett, Dr. Richard Barrett, William M. Lyon, and Richard V. Williams)," to his complaint and brief in this congressional reference proceeding, these additions do not change the scope of this Court's review or recommendations by this Court to Congress under 28 U.S.C. § 2509.

Plaintiff cites *Schutt Construction Co., Inc. v. United States,* 173 Ct.Cl. 836, 353 F.2d 1018 (1965), in support of its claim that the names of individuals other than Richard Kanehl should not be removed from this proceeding. *Schutt* does not provide support for plaintiff. Rather, in *Schutt,* the congressional relief bill referred to our predecessor Court of Claims specifically considered payment to a prime contractor "on behalf of its subcontractor." *Schutt,* 173 Ct.Cl. at 859, 353 F.2d 1018.[4] Neither S. Res. 108 nor S.

974 contemplate payment to Richard Kanehl on behalf of anyone other than Richard Kanehl. As noted previously, S. Res. 108 and S. 974 refer solely to the relief of "Richard Kanehl of Mobile, Alabama." No other parties having been mentioned for relief in the congressional reference to this court, none will be considered. Individuals and groups other than Richard Kanehl shall not be considered as plaintiffs in this congressional reference proceeding.

## II. Factual Findings of Prior Congressional Reference Cases

The facts alleged by the plaintiff in this proceeding are extracted mainly from three sources. These are *Merchants National Bank of Mobile v. United States,* 5 Cl.Ct. 180, *Merchants National Bank of Mobile v. United States,* 7 Cl.Ct. 1 (1984), and the Declaration of Richard Kanehl. Defendant objects to plaintiff's use of this court's opinions in the *Merchants National Bank of Mobile* congressional reference proceedings in the plaintiff's motion for partial summary judgment.

### A. Collateral Estoppel in Congressional Reference Cases

■ In congressional reference cases, the report from this Court to Congress is advisory in nature and has no binding value as precedent. *Paul,* 20 Cl.Ct. at 266. The facts established in each congressional reference proceeding are peculiar to that individual action. *Id.* at 266. As our predecessor, the Court of Claims, stated in *Rawlins v. United States,* "[w]e are not bound by the facts or conclusions made by the congressional reference review panel, but we can make our own findings of fact based upon the stipulated facts and documents, reach our conclusions thereon, and apply the appropriate standard to determine the merits of [the plaintiff's] claim." 231 Ct.Cl. 313, 318–19, 686 F.2d 903 (1982). *Rawlins,* then, determined that the findings and conclusions of a trial commissioner or review panel do not result in final judgment, but rather are only

---

**4.** S. 974 does contemplate payment to Richard Kanehl "for damages incurred by the said Richard Kanehl and the Dri–Mix Corporation ...," but S. 974 does not contemplate payment to Kanehl *on behalf of* any other person or party.

advisory in nature. *Id.* at 317–19, 686 F.2d 903.

By contrast, plaintiff maintains that *Rymarkiewicz v. United States,* 42 Ct.Cl. 1, 1906 WL 900 (1906), binds this Court to the findings of fact determined in a prior congressional reference involving the same facts. *Rymarkiewicz* does not stand for this proposition. In *Rymarkiewicz,* the Court of Claims refused to recommend that the plaintiff receive either legal or equitable relief because the plaintiff was found to be disloyal to the United States. *Id.* at 2–6. Because the question of loyalty was found to be a jurisdictional prerequisite under the Bowman Act, the Court of Claims found that it had no authority to proceed further on the claim and reported its finding to Congress. *Id.* at 2. Congress thereafter referred the same claim to the Court of Claims under an unchanged Bowman Act. *Id.* Because the Court had found that it had no jurisdiction under the Bowman Act, and because Congress did not undertake to change the terms of the Bowman Act, the Court of Claims found itself bound by its prior determination that it had no jurisdiction over the case. *Id.* at 2–3. *Rymarkiewicz* holds, therefore, that once a court has determined that it has no jurisdiction over a congressional reference case, Congress cannot thereafter attempt to vest a court with jurisdiction simply by referring the same case to the same court.

■ *Rymarkiewicz* did state that "[i]t is elementary that the same court can only render judgment once between the same parties upon the same issue unless the judgment has been reversed or set aside, or for some other reason a new trial has been granted." 42 Ct.Cl. 1. This language in *Rymarkiewicz* was not central to the court's holding as explained above. Nevertheless, even this language merely suggests that once a court has made a recommendation in a congressional reference case, a subsequent congressional reference between identical parties on identical issues involving identical facts cannot change the result recommended by the court in the prior congressional reference. In any event, plaintiff in the present congressional reference seeks to apply collateral estoppel based on the facts of a prior

congressional reference where the plaintiff is different, the relief sought is different, and the issues involved are different. *Rawlins* effectively disposes of plaintiff's contention that collateral estoppel precludes this Court from making findings of fact that differ from those in *Merchants I,* and *Merchants II. See Rawlins,* 231 Ct.Cl. at 317–19, 686 F.2d 903. Neither the fact determinations nor the legal determinations of a prior congressional reference case, therefore, bind this Court in the present congressional reference case.

### B. Use of Facts from Prior Congressional Reference Cases

■ Although the factual findings in a prior congressional reference proceeding do not preclude this court from making new findings of fact, this court can consider the factual findings of a prior congressional reference case on a motion for summary judgment. The factual findings in a prior congressional reference case are public record. Where, as here, they are relevant to, and probative of, the facts in the present case, they are properly considered. *See* Fed.R.Evid. 401. Additionally, plaintiff has included a declaration that serves as evidence for his claim independently of plaintiff's references to the prior congressional reference cases. Further, even if plaintiff's references to prior congressional proceedings were not admissible evidence, those prior congressional proceedings would still be properly considered in evaluating the defendant's motion for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Finally, consideration of the facts in prior congressional reference cases referred to by the plaintiff does not change the court's conclusion in this proceeding.

### III. Summary Judgment Standard

Both plaintiff and defendant in this case have moved for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Security Bank & Trust v. United States,* 31 Fed.Cl. 589, 591 (1994). The moving party

bears the burden of demonstrating the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993). Where, as here, both parties are moving for summary judgment, they each bear this burden with respect to their individual motion for summary judgment. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Inferences drawn from the evidence produced must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The non-moving party need not produce evidence in a form admissible at trial to avoid summary judgment. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

Disposing of congressional reference cases by summary judgment was, at one time, prohibited. *See* RCFC App. D, ¶ 14 (1976); *see also Bear Claw Tribe, Inc. v. United States,* 36 Fed.Cl. 181, 187 (1996), *aff'd,* 37 Fed.Cl. 633 (1997). Such prohibition no longer exists. Appendix D to the Rules of the Court of Federal Claims now directs the Court to apply the RCFC to the extent feasible in congressional reference cases. RCFC App. D ¶ 1 (1994); *see Bear Claw Tribe, Inc.,* 36 Fed.Cl. at 187. Indeed, this Court has held that summary judgment may be proper in a congressional reference case. *Bear Claw Tribe, Inc.,* 36 Fed.Cl. at 186–87, 192 (summary judgment granted); *INSLAW, Inc. v. United States,* 35 Fed.Cl. 295, 303–04 (1996) (partial summary judgment granted).

## IV. Legal and Equitable Relief in Congressional Reference Proceedings

■ Under the terms of 28 U.S.C. § 2509(c), this Court must ascertain whether Kanehl has presented sufficient evidence to support a claim for legal or equitable relief, or whether relief would be a gratuity. If the plaintiff has a legal or equitable claim, the court will recommend relief. If relief would constitute a mere gratuity, however, the court will recommend that Congress deny relief. *See White Sands Ranchers v. United States,* 14 Cl.Ct. 559, 565 (1988).

■ The term "legal claim" has no special meaning, beyond the conventional understanding of that term, as used in a congressional reference proceeding. *Bear Claw Tribe, Inc.,* 36 Fed.Cl. at 186; *Land v. United States,* 29 Fed.Cl. 744, 751 (1993); *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 247 (1993); *White Sands Ranchers,* 14 Cl.Ct. at 565. A legal claim, therefore, refers to a demand that is based upon a substantive right, the invasion of which is redressable at law. *White Sands Ranchers,* 14 Cl.Ct. at 565; *California Canners & Growers Ass'n v. United States,* 7 Cl.Ct. 69, 97 (1984). Such an invasion may be " 'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which ·confers a privilege.' " *Spalding & Son, Inc.,* 28 Fed.Cl. at 247 (quoting *Tennessee Elec. Power Co. v. TVA,* 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939)). Even if the plaintiff in a congressional reference might otherwise have a valid claim to legal recovery on the merits that legal claim may nonetheless be barred by some technical or procedural impediment including, but not limited to, the statute of limitations, laches, or release of claims. *California Canners & Growers Ass'n,* 7 Cl.Ct. at 97.

■ If it is determined that the plaintiff does not have a legal claim against the United States, the Court must then address whether the plaintiff has an equitable claim. *California Canners & Growers,* 7 Cl.Ct. at 97. The term "equitable claim" does take on a special meaning as used in congressional reference actions. *Bear Claw Tribe, Inc.,* 36 Fed.Cl. at 186; *White Sands Ranchers,* 14 Cl.Ct. at 565. The precise meaning of the term "equitable claim" in congressional reference proceedings is, however, rather opaque in the light of the prior decisions of this Court and our predecessor United States Court of Claims. *See* Jeffrey M. Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am. L.Rev. 595, 617–27 (1976). Some of the Court's decisions seem to define equitable claim in the broad sense of the moral obligation of the govern-

ment. *Phillips v. United States,* 207 Ct.Cl. 924, 929 (1975); *Burkhardt v. United States,* 113 Ct.Cl. 658, 84 F.Supp. 553, 559 (1949). The Court's more recent decisions, however, appear to restrict the availability of equitable relief to those situations in which the government is negligent or otherwise at fault. *Sneeden v. United States,* 33 Fed.Cl. 303, 309 (1995); *Spalding & Son,* 28 Fed.Cl. at 250–51; *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 180 F.Supp. 386, 390 (1960). Equitable relief in these situations is available when "a claimant, though injured by Government action, either has no remedy under existing law or the remedy has become barred because of a statute of limitations." *Spalding & Son, Inc.,* 28 Fed.Cl. at 250.

### A. Nature of the Relief Requested

In the present action, plaintiff contends that the injury he suffered is due to government fault. Essentially, plaintiff's claim is that, as a result of the arbitrary and capricious actions of the government, the government breached the contract between Dri–Mix and the United States government for MCI's thereby forcing Dri–Mix into bankruptcy. Plaintiff alleges that, as a result of the bankruptcy, he and the "Dri–Mix group" suffered damages of $6,563,000 for unrecovered losses. Plaintiff further contends that the government's arbitrary and capricious actions deprived the children of Kanehl financial support for their education. Defendant disputes that plaintiff is due any relief.

Plaintiff does not allege that he has a legal claim against the United States; rather he asserts that he, and the "Dri–Mix Group" have an equitable claim against the United States. As the discussion below makes clear, plaintiff could not prove a legal claim against the government, even had plaintiff asserted one.

### B. Privity of Contract

Defendant argues that the plaintiff cannot state a claim upon which relief can be granted because plaintiff is not in privity of contract with the government and is not the real party in interest under RCFC 17(a). Plaintiff responds by averring that privity of contract is not required for a plaintiff to prove

an equitable claim in a congressional reference case.

A party has standing to bring a claim for breach of contract if it is in privity of contract with the government. *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984); *Hemphill Contracting Co. v. United States,* 34 Fed.Cl. 82, 84 (1995). Absent privity, a party has no standing to sue, and the court is without jurisdiction to resolve issues raised by a claimant. *Hemphill Contracting Co.,* 34 Fed.Cl. at 84; *California Sand and Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 24 (1990), *aff'd without op.,* 937 F.2d 624 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992). In a "legal" contractual claim, the only party with standing to sue the government is the party with whom the government contracted. The government contracted with the Dri–Mix Corporation in this case. As such, Richard Kanehl, the plaintiff here, has no standing to sue the government unless he and Dri–Mix are the same entity. *See Hemphill Contracting Co.,* 34 Fed.Cl. at 84. Kanehl has not proved that he and Dri–Mix are the same entity. At law, therefore, Kanehl would have no standing to sue the government in a claim for breach of contract. Dri–Mix, however, contracted with the government and would, at law, have standing to sue the government for breach of contract.

The unavailability of a contractual claim at law, however, does not abrogate plaintiff's claim to equitable relief under 28 U.S.C. §§ 1492 and 2509 where the government is at fault and has caused damage to the plaintiff. *See Schutt Constr. Co.,* 173 Ct.Cl. at 841–45, 353 F.2d 1018; *Nash v. United States,* 141 Ct.Cl. 135, 138–39, 1958 WL 7362 (1958); *see also Spalding & Son, Inc.,* 28 Fed.Cl. at 250; *Merchants II,* 7 Cl.Ct. at 9. Merely because plaintiff would not be in privity with the government, and would not be the real party in interest, in an action at law for breach of contract does not mean that plaintiff has no standing to sue the government in this congressional reference action. Under 28 U.S.C. § 1492, Congress is specifically authorized to refer bills, except bills of pension, to the Court of Federal Claims for report in conformity with 28

U.S.C. § 2509. Section 2509, in turn, provides for Congress to request this Court make certain recommendations with regard to the bill referred pursuant to 28 U.S.C. § 1492. In the present case, Congress referred a bill, not for pension, to this Court requesting that this Court make certain findings regarding whether relief should be granted to Richard Kanehl, the plaintiff. *See* S. 974, 103d Cong., 1st Sess. (1993); S. Res. 258, 103d Cong., 2d Sess., 140 Cong. Rec. S14077 (1994). Under 28 U.S.C. § 1492 and 28 U.S.C. § 2509, therefore, there exist independent statutory grounds for a plaintiff to bring a claim for equitable relief in the Court of Federal Claims.

The Court of Claims considered this issue in *Schutt Construction Co. Inc.*, 173 Ct.Cl. 836, 353 F.2d 1018 (1965). There, the Court considered whether, in a congressional reference proceeding, a subcontractor could bring a claim against the government for equitable relief where a prime contractor and a subcontractor had executed a release of claims in a subcontract based upon a contract between the prime contractor and the government. *Id.* at 840–41, 353 F.2d 1018. Although the court concluded that there was no privity between the subcontractor and the government such that the subcontractor could bring an action at law, the court allowed the claim for equitable relief under the congressional reference procedure.[5] *Id.*

Similarly, in *Nash v. United States*, the plaintiff claimed the right to equitable relief in a congressional reference case alleging that he had been denied compensation for work he completed for the Public Housing Authority. 141 Ct.Cl. 135, 136–38 (1958). Although the plaintiff never had a formal contract with the government, he was instructed by the government to proceed with the work he did for the Public Housing Authority. *Id.* The Court of Claims found that the plaintiff did not have a legal claim against

the Public Housing Authority because he lacked privity of contract with the government. *Id.* at 138. Nevertheless, the court held that the plaintiff did have an equitable claim against the government for the value of the services he provided to the government where the government encouraged him to perform the work and incurred damage to the extent of the value of his work as a direct result of the government's action. *Id.* at 139–42. Lack of privity of contract with the government will not bar a claim for equitable relief in a congressional reference case, therefore, where a plaintiff can demonstrate that wrongful government conduct caused direct harm to a plaintiff. *See Spalding & Son, Inc.*, 28 Fed.Cl. at 250.

### C. The Real Party in Interest Requirement

■ Further, plaintiff Kanehl is the real party in interest within the meaning of Rule 17(a) in the context of the present congressional reference action. Rule 17(a) of the Rules of the Court of Federal Claims provides, "[e]very action shall be prosecuted in the name of the real party in interest.... [A] party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought." A real party in interest, under RCFC 17(a), is the party that " 'possesses the substantive right under which the suit is brought.' " *Hemphill Contracting Co.*, 34 Fed.Cl. at 85 (quoting *Wall Indus. v. United States*, 15 Cl.Ct. 796, 803 (1988), *aff'd without op.*, 883 F.2d 1027 (Fed.Cir.1989)). Were this an action at law for breach of contract, it is true that plaintiff would not be the real party in interest, unless he were representing Dri–Mix. *See Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 662, 428 F.2d 1241

---

**5.** As noted previously, at law, a party without privity lacks standing to sue. *See Erickson Air Crane Co.*, 731 F.2d at 813; *Hemphill Contracting Co.*, 34 Fed.Cl. at 84. Although an entity of Article I of the Constitution, 28 U.S.C. § 171 (1982), this court normally applies the Article III standing requirements enforced by other federal courts. *American Maritime Transport, Inc. v. U.S.*, 18 Cl.Ct. 283, 290–91 (1989). Nevertheless,

a limited exception to the Article III standing requirements are advisory rulings issued by this court pursuant to 28 U.S.C. §§ 1492, 2509. *Id.* at 290–91 n. 2. Such advisory rulings are not considered actual cases or controversies under Article III. *Id.* (citing *Muskrat v. United States*, 219 U.S. 346, 362–63, 31 S.Ct. 250, 255–56, 55 L.Ed. 246 (1911)).

(1970), *supplemented by*, 198 Ct.Cl. 258, 458 F.2d 1373 (1972). Plaintiff had no contractual relationship with the government; only Dri–Mix had a contract with the government. However, as noted above, Congress specifically requested that this Court make findings as to whether relief to plaintiff was legally or equitably due, or would constitute a gratuity. As plaintiff was specifically named in the congressional reference authorized by 28 U.S.C. § 1492 and 28 U.S.C. § 2509, plaintiff is the real party in interest in the present congressional reference proceeding.[6]

### D. Accord and Satisfaction, Waiver, and Release [7]

Defendant contends that plaintiff's congressional reference action is barred by the doctrines of accord and satisfaction, waiver, and release. Plaintiff replies that his action is not so barred because of the unique nature of equitable relief in a congressional reference proceeding.

#### 1. Accord and Satisfaction

■ An "accord" is "an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due." *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981). "Satisfaction" is "the execution or performance of the agreement, or the actual giving and taking of some agreed thing." *Id.* In the present congressional reference, defendant contends that the settlement agreement executed between Dri–Mix, through the bankruptcy trustee, and the government, should bind Richard Kanehl. Plaintiff contends, however, that he is not bound by the Dri–Mix settlement, and that Richard Kanehl

was never a party to the settlement agreement.

To the extent the plaintiff contends that he should be able to recover for the injuries suffered by Dri–Mix, the court finds that Dri–Mix's claims are barred by the terms of the settlement agreement between Dri–Mix and the United States. The Dri–Mix settlement agreement was executed between Dri–Mix's trustee in bankruptcy, Merchants, DLA, the Internal Revenue Service and the United States Department of Agriculture. The settlement agreement provided that Dri–Mix would withdraw its claims against the United States then pending before the ASBCA. In return, Merchants and the government agencies party to the settlement agreement agreed to withdraw or substantially reduce claims that were then pending against Dri–Mix. As both the record and plaintiff's concession in oral argument indicate, Richard Kanehl was aware of the settlement negotiations prior to the settlement, and of the terms of the settlement agreement subsequent to execution.

By its very terms, the settlement agreement effected a "mutual release between the bankruptcy estate [Dri–Mix] and the trustee, on the one hand, and DLA on the other hand, of all legal and equitable claims and matters of every type, kind and nature whatsoever, except. [where] provided." Def.App. at 35–36. While Merchants reserved, in the terms of the settlement, the right to relief under 28 U.S.C. §§ 1492 and 2509, Dri–Mix did not. The settlement was signed by the trustee in bankruptcy for Dri–Mix. The settlement agreement was approved by Bankruptcy Judge Will G. Caffey, Jr. of the Southern District of Alabama by Order of November 20, 1980. In sum, Dri–Mix's claims were satisfied by the terms of the settlement in 1980. The settlement agreement served as

---

6. Furthermore, the rationale behind the real party in interest requirement is to "shield the defendant from subsequent suits on the same action and to give the judgment rendered proper *res judicata* effect." *American Maritime Transport, Inc. v. United States*, 18 Cl.Ct. at 290. Because congressional reference proceedings have no binding effect upon future proceedings at law, the rationale for the real party in interest requirement is less compelling.

7. The defenses of accord and satisfaction, waiver, and release were not originally included in defendant's answer. Plaintiff suffered no prejudice as a result because both parties had an opportunity, and did, address these legal defenses both in their briefs and during oral argument. Further, the court is obligated to consider these defenses where the parties have raised them and the defenses have bearing on this court's recommendation to Congress pursuant to the congressional reference procedure.

an accord, and the execution of that settlement was satisfaction of Dri–Mix's, Merchants' and the government's claims against each other. Dri–Mix should not be permitted to claim, some sixteen years after the settlement, and eighteen years after the events at issue, that Dri–Mix is not barred by the terms of the settlement.

### 2. Settlement in Congressional Reference Cases

The present action is similar in some ways to that in *Sneeden v. United States*, 31 Fed. Cl. 671 (1994) ("*Sneeden I* "), *aff'd* 33 Fed.Cl. 303 (1995) ("*Sneeden II* "). In *Sneeden I*, a subcontractor brought a claim against the government alleging that it could not perform its subcontract due to defective and changed specifications issued by the government after the original contract award. 31 Fed.Cl. at 673. The subcontractor took its case to the Engineering Board of Contract Appeals (EBCA) in December 1980. *Id.* The EBCA did not issue an opinion for five years. *Id.* In the period between the completion of the project and the EBCA decision, the subcontractor's financial situation deteriorated to the point where the subcontractor had no surety and was, therefore, unable to secure additional contracts. *Id.* Ultimately, the subcontractor filed for bankruptcy. *Id.*

When the EBCA did finally issue a decision, it decided only that the subcontractor should prevail on the issue of liability and directed the parties to settle the amount due by negotiation. *Id.* The parties did finally settle the claim and the subcontractor agreed "to release the Government from all claims, appeals, rights of action and suits arising out of or under the contract for the Project." *Sneeden I*, 33 Fed.Cl. at 307. Apparently not satisfied with the terms of the settlement, and contending that the government acted in bad faith in settling the claim with the subcontractor, the stockholders and offi-

cers of the subcontractor sought relief through a congressional private relief bill. *Sneeden I*, 31 Fed.Cl. at 672. Although the hearing officer in *Sneeden I* recognized the dire financial straits of the subcontractor at the time of the settlement, the hearing officer found little evidence to support plaintiff's argument that the United States had acted in bad faith in settling the claim. *Id.* at 676–77. The hearing officer also found little evidence that the settlement was unfair or coercive. *Id.* A review panel of this Court upheld the recommendation of the hearing officer. *Sneeden II*, 33 Fed.Cl. at 310–12.

In the present action, there is no evidence of coercion or bad faith on the part of the government such that the settlement agreement should be declared void. In fact, plaintiff conceded in oral argument that he was not claiming that the settlement had been entered into under duress. Tr. at 54.

### 3. Settlement Powers of a Trustee in Bankruptcy

■ Despite the settlement agreement, plaintiff contends that he should not be bound by the settlement because plaintiff did not sign the agreement for Dri–Mix. At oral argument, plaintiff suggested that the trustee's primary loyalty was not to the shareholders of Dri–Mix, but rather to Dri–Mix's creditors. Plaintiff's contentions are incorrect, however, and Dri–Mix is bound by the terms of the settlement.

In *Commodity Futures Trading Commission v. Weintraub*, the Supreme Court noted that "[t]he powers and duties of a bankruptcy trustee are extensive. Upon the commencement of a case in bankruptcy, all corporate property passes to an estate represented by the trustee." 471 U.S. 343, 352, 105 S.Ct. 1986, 1992, 85 L.Ed.2d 372 (1985); *see* 11 U.S.C. § 1106(a), *see also* 11 U.S.C. §§ 323, 704.[8] A trustee has the ability to both sue

---

8. Dri–Mix filed for bankruptcy in February 1978. The Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et seq.*, did not become generally effective until October 1, 1979. *See* 11 U.S.C. § 101 note. The Bankruptcy Act of 1978, Pub.L. No. 95–598, § 403, 92 Stat. 2683 (1978), as amended by Pub.L. No. 98–353, § 382, 98 Stat. 364 (1984), provides that: ·

(a) A case commenced under the Bankruptcy Act [Act July 1, 1898, c. 541, 30 Stat. 544, as amended], and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of the parties in connection with any bankruptcy case, matter, or proceeding shall

and be sued. 11 U.S.C. § 323. Where a corporation may have a valid claim against another, a trustee should be allowed to "let the suit continue under the stockholders' auspices; to intervene in it; to start a new suit; or, in case he deems it more provident from the point of view of the estate to make settlement of the claim or to reserve it for the reorganized company, to cause it to be abated." *Meyer v. Fleming,* 327 U.S. 161, 167–68, 66 S.Ct. 382, 386, 90 L.Ed. 595 (1946).

*Weintraub* stated that "the fiduciary duty of the trustee runs to the shareholders as well as to creditors." *Weintraub,* 471 U.S. at 355, 105 S.Ct. at 1994 (citing *In re Washington Group, Inc.,* 476 F.Supp. 246, 250 (M.D.N.C.1979), *aff'd sub. nom Johnston v. Gilbert,* 636 F.2d 1213 (4th Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3084, 69 L.Ed.2d 954 (1981)); *In re Ducker,* 134 F. 43, 47 (6th Cir.1905)). Where a trustee fails to exercise due diligence in performing his duties, he may be held liable. *See Carson, Pirie, Scott & Co. v. Turner,* 61 F.2d 693, 694 (6th Cir.1932); *In re Center Teleproductions, Inc.,* 112 B.R. 567, 575–76 (Bankr.S.D.N.Y. 1990); *Reich v. Burke,* 54 B.R. 995, 998 (Bankr.E.D.Mich.1985).[9] A court may also remove a trustee for cause following notice and hearing. 11 U.S.C. § 324. Further, at least one circuit has indicated that the shareholders of a corporation may have standing to contest a settlement entered into by a corporation's trustee in bankruptcy where the shareholders' interests are not adequately represented. *See In re Central Ice Cream Co.,* 836 F.2d 1068, 1072–73 (7th Cir.1987).

Dri–Mix's trustee in bankruptcy, therefore, owed a fiduciary duty to both Dri–Mix's creditors and Dri–Mix. The trustee was empowered, indeed obligated, to act for the benefit of both Dri–Mix's creditors and Dri–Mix's shareholders. The trustee acted on behalf of Dri–Mix, and Dri–Mix was bound by his actions so long as the trustee did not breach his fiduciary duty. If Dri–Mix believed the trustee breached his fiduciary duties, Dri–Mix's remedy was to sue the trustee. Dri–Mix has not sued the trustee. Nor has Dri–Mix contested the terms of the settlement. Neither Dri–Mix nor Kanehl, therefore, is entitled to claim a remedy where Dri–Mix elected to forgo any remedy it might have received if the trustee had improperly entered into settlement on Dri–Mix's behalf.[10]

Dri–Mix was adequately represented in the settlement negotiation, at least to the extent plaintiff is adequately represented in this proceeding,[11] and the settlement appears fair on its face. In fact, the terms of the settlement suggest that Dri–Mix benefited from the settlement because, by the terms of the settlement, DLA agreed to withdraw a $5,878,573 claim against Dri–Mix and to pay Dri–Mix $880,000. Def.App. at 35. The Bankruptcy Court approved the settlement, and this Court refuses to determine that the Bankruptcy Court's approval was erroneous. The Court finds, therefore, that Dri–Mix, as well as the shareholders and officers of Dri–Mix, are bound by the terms of the settlement.

### 4. *Waiver and Release*

Further, Dri–Mix waived its right to bring a congressional reference action when

---

continue to be governed by the law applicable to such case, matter, or proceeding as if the [this] Act had not been enacted.

As such, Dri–Mix's bankruptcy is guided, generally, by the Bankruptcy Act of 1898. Nevertheless, while the 1978 Bankruptcy Reform Act may have made the fiduciary obligations of a trustee in bankruptcy more explicit, *see e.g.,* 11 U.S.C. § 323, it did not change the trustee's fiduciary obligations to the debtor, nor the trustee's status as the "representative of the estate." *Matter of O.P.M. Leasing Servs., Inc.,* 13 B.R. 54, 58 (Bankr.S.D.N.Y.), *aff'd,* 13 B.R. 64 (S.D.N.Y. 1981).

9. The extent of a trustee's liability is a matter of some dispute. *See In re Center Teleproductions,*

*Inc.,* 112 B.R. at 576–78 (noting the dispute and citing cases).

10. Dri–Mix never contested the Bankruptcy Court's decision approving the settlement agreement. For this Court to find that the settlement agreement should not bind Dri–Mix would, effectively, amount to judicial review by the Court of Claims of the decision of a Bankruptcy Court in another jurisdiction.

11. Lawrence Farrell, plaintiff's counsel in this proceeding, was special counsel for the trustee in bankruptcy for Dri–Mix in the settlement agreement.

it executed the settlement agreement. A waiver requires the intentional relinquishment of a known right. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 521 (1995). In *Harvey–Whipple, Inc. v. United States,* 169 Ct.Cl. 689, 342 F.2d 48 (1965), the Court of Claims considered whether a plaintiff's voluntary release of its claim against the government would preclude the plaintiff from receiving an equitable award in a congressional reference proceeding. *Id.* at 696–97, 342 F.2d 48. Where the release was not forced upon the plaintiff and the plaintiff had received bargained for consideration in return for the release, the court found that the release would bar the court from recommending the plaintiff receive equitable relief. *Id.* at 698–700, 342 F.2d 48.

In the present action, Dri–Mix received bargained for consideration when the settlement was executed. Among other things, DLA agreed to withdraw its claims against Dri–Mix and to pay Dri–Mix a sum of money. In return, Dri–Mix agreed to withdraw its claim against DLA which was then pending before the ASBCA. Additionally, as indicated above, Dri–Mix's actions were voluntary and were not procured through coercion, nor due to bad faith by the government in the settlement negotiations. Finally, while another party to the same settlement agreement—Merchant's Bank—reserved the right to bring a congressional reference proceeding notwithstanding the settlement, Dri–Mix did not reserve such a right. Dri–Mix, therefore, waived its right to equitable relief in the present action when it executed a release of claim against the government pursuant to the terms of the settlement agreement.

## E. Statute of Limitations

Plaintiff argues that his right to equitable relief is not limited by the applicable statute of limitations and that it would be inequitable to hold that the statute of limitations bars plaintiff's claim because plaintiff has been diligent in bringing this congressional reference proceeding. Defendant responds that the applicable statute of limitations should bar the plaintiff's claims.

The statute of limitations for bringing a claim in the Court of Federal Claims is six years after the plaintiff's cause of action accrues. 28 U.S.C. § 2501. A claim first accrues "when all the events fixing the defendant's liability have occurred." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988); *Neva Vera Barnes McQuown v. United States,* 199 Ct. Cl. 858, 873 (1972) ("*McQuown*"). The six-year statute of limitations on actions against the United States is a jurisdictional bar that conditions the government's waiver of its sovereign immunity. *Hopland Band of Pomo Indians,* 855 F.2d at 1576–77.

Any possible legal claim by the plaintiff would have accrued, at the latest, in late 1980 following Dri–Mix's bankruptcy and the execution of the settlement agreement between Dri–Mix, Merchants, and the United States. By the time of the Dri–Mix bankruptcy and the execution of the settlement agreement between Dri–Mix, Merchants and the government, plaintiff was undoubtedly aware of the events upon which plaintiff now posits his claim for relief. The court finds that the statute of limitations on plaintiff's contract claim expired, at the latest, sometime in late 1986. Plaintiff, therefore, would be barred at law from bringing a claim against the government.

Under § 2509(c) and the provision for a recommendation of equitable relief, however, this court will recommend that the bar of the statute of limitations be lifted if there is good cause. *McQuown,* 199 Ct.Cl. at 874. Good cause is found " 'where the government's administrative consideration of the claim was slipshod and desultory, thereby contributing to the delay which caused the damage; where the claimant has relied on Government advice to his detriment; where he was not sleeping on his rights because justifiably relying on others; where the Government has been unjustly enriched; and where the failure to proceed in a timely fashion was the result of incapacity.' " *Id.* at 874 (quoting M.T. Bennett, *Private Claims and Congressional References,* H. Comm. Print, 90th Cong., 2d Sess. 10 (1968)).

The Court finds that plaintiff did not have good cause for failing to bring his action within the term of the statute of limitations. Dri–Mix had, prior to the execution of the settlement, brought a claim before the ASBCA. Dri–Mix chose not to pursue its legal claims, however. Instead, Dri–Mix elected to enter into a settlement agreement that provided for the release of plaintiff's ASBCA claim. Dri–Mix was neither, therefore, incapable of bringing a claim for relief, nor relying on the government to its detriment. Dri–Mix cannot claim that administration of its claim was slipshod or desultory because Dri–Mix voluntarily abandoned its claim for relief before the ASBCA. Dri–Mix, when faced with alternative means of securing relief, pursued that form which it found most appealing.

Finally, the government was not unjustly enriched. Both the government and Dri–Mix received bargained for consideration. Although Dri–Mix might have contested the settlement if it believed the settlement was negotiated in bad faith, it has not elected to pursue such relief. The court finds, therefore, that there does not exist good cause to lift the statute of limitations that would bar Dri–Mix's claim at law.

### F. Laches

Defendant contends that plaintiff's claim should be barred by the doctrine of laches because over fourteen years passed between the time Dri–Mix filed for bankruptcy in 1978 and the time the first private bill for plaintiff's relief was introduced in Congress in 1993. As a result of the long passage of time, defendant contends that the government suffers prejudice in defending against plaintiff's claim due to the dimming of witnesses' memories. Plaintiff responds that the defendant has not demonstrated prejudice to the government as a result of the delay and that any possible prejudice to the government in presenting its case is obviated by litigation of the same factual issues in *Merchants Bank I* and *Merchants Bank*

*II.* Plaintiff represented that he continually pursued some form of congressional relief since 1978, although he later withdrew that representation and suggested that he did not begin to pursue relief until 1983. Although defendant characterizes plaintiff's representations as "vague," defendant does not contest their validity.[12]

Laches is an equitable defense that rests on considerations on fairness. *Acuna v. United States,* 1 Cl.Ct. 270, 279 (1982). Laches denies relief to one who unreasonably and inexcusably delays in the assertion of a claim, where the delay results in injury or prejudice to the party against whom the claim is asserted. *Deering v. United States,* 223 Ct.Cl. 342, 347, 620 F.2d 242 (1980); *Acuna,* 1 Cl.Ct. at 279. The Court finds that laches should bar plaintiff's claim. Plaintiff's contention that he contacted persons in Congress during the years 1983 to 1993 in an attempt to bring a congressional reference action does not by itself demonstrate diligent pursuit of plaintiff's claim.

It has been over eighteen years since the events upon which plaintiff bases his claim transpired. Almost thirteen years have passed between the time the settlement agreement was executed in 1980 and the time S. Res. 108 was enacted referring plaintiff's private bill for relief to this Court in 1993. There can be no doubt that memories will have faded regarding the events that took place prior to Dri–Mix's bankruptcy in 1978 and the settlement agreement executed between Dri–Mix, the government, and Merchants in 1980. Additionally, it is noteworthy that Dri–Mix elected not to pursue relief in the ASBCA, but rather to execute a settlement agreement with the government in 1980. Thus, although Dri–Mix could have taken the opportunity to pursue relief prior to 1980, it settled its claims. It would be inequitable to require the government to defend against an action arising more than thirteen years after the date upon which Dri–Mix could have, and did begin to, pursue

---

12. Plaintiff's declaration, as one based on plaintiff's personal knowledge and setting forth matters to which plaintiff is competent to testify, satisfies the requirements of RCFC 56(f). Further, the Court notes that the form of plaintiff's declaration conforms to the requirement for declarations substituting for affidavits under 28 U.S.C. § 1746. *See also MacMurray v. United States,* 15 Cl.Ct. 323, 331 (1988).

relief, but where Dri–Mix later abandoned that opportunity. *Cf. Spalding & Son, Inc.,* 28 Fed.Cl. at 251 (Merow, J., concurring) ("Congress has traditionally required that available administrative and legal remedies be exhausted before congressional reference action is undertaken."). Further, both plaintiff and Dri–Mix have had the opportunity to pursue relief by attempting to vacate the settlement agreement executed in 1980. Not having taken the opportunity in sixteen years, it would be inequitable to require the government to defend against a claim founded upon facts occurring in the late 1970's.

*V. Kanehl's Personal Injuries*

■ At law, actions by or against corporations are maintained in the name of the corporation, even where the person suing is the only shareholder of the corporation. *See* 9 Charles R.P. Keating & Gail A. O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 4218 (1991); *see also id.* at § 4231 ("Corporate rights of action are distinct from those of members or stockholders.... The corporation, and it alone, may sue to recover property of the corporation or to recover damages for injuries done to it."). According to the terms of the congressional reference, however, the present action is for the relief of Richard Kanehl for injuries suffered by Kanehl *and* Dri–Mix. As discussed previously and because of the equitable nature of a congressional reference action, Kanehl is not barred from bringing the present action though he was not in privity of contract with the government. At oral argument, however, plaintiff represented that his claim was not for damages he suffered *personally,* but rather solely to recover for damages suffered by Dri–Mix. Tr. at 45–46. In fact, Kanehl disavowed any claim to damages other than those suffered by Dri–Mix. *Id.* Accordingly, Kanehl cannot recover for personal damages he allegedly suffered.

## CONCLUSION

For the reasons stated, it is recommended that Congress not authorize payment to Richard Kanehl of Mobile, Alabama as set forth in S. 974, the bill referred to this court. The Court concludes that plaintiff has nei-

ther a legal nor an equitable claim against the United States, and that to make an award would be a gratuity. Accordingly, plaintiff's motion for partial summary judgment is denied, and defendant's motion for summary judgment is granted.